[No. A118186. First Dist., Div. Two. Jan. 14, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
LEE DAVID HARBERT, Defendant and Appellant.

**COUNSEL**

Riordan & Horgan, Dennis P. Riordan, Donald M. Horgan and Michael Romano for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Martin S. Kaye, Michael E. Banister and Christopher W. Grove, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RICHMAN, J.**—Vehicle Code section 20003 requires the driver of a vehicle that is involved in an accident resulting in injury or death to provide, among other things, identifying information and, if necessary, assistance to the injured person. Vehicle Code section 20001 directs that "The driver of a vehicle involved in an accident resulting in injury to a person, other than himself or herself, or in the death of a person shall immediately stop the vehicle at the scene of the accident and shall fulfill the requirements of Section[] 20003 . . . ." And if the accident results in death or permanent serious injury, the failure to stop and provide information and/or assistance "shall be punished by imprisonment in the state prison for two, three, or four years." (Veh. Code, § 20001, subds. (a), (b)(2) (section 20001).)

Section 20001 has long been deemed to impose a knowledge requirement which requires proof the accused knew or was aware that (1) he or she was involved in an accident and (2) the accident resulted in injury to another. As to the latter, our Supreme Court has construed section 20001 to require proof that the defendant "[knew] that the accident resulted in injury to a person or [knew] that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person." (*People v. Holford* (1965) 63 Cal.2d 74, 83 [45 Cal.Rptr. 167, 403 P.2d 423] (*Holford*).) Here, the trial court instructed on the knowledge requirement with CALJIC No. 12.70, and the jury convicted defendant Lee David Harbert of violating section 20001, and while doing so personally inflicting great bodily harm (Pen. Code, § 12022.7, subd. (a)). The trial court sentenced defendant to state prison for the middle term of three years for the violation of section 20001, with an identical term for the great bodily injury enhancement, the latter stayed pursuant to Penal Code section 654.

Defendant contends that, unlike knowledge of whether a person has been injured, where *constructive* knowledge is accepted, the other knowledge requirement in section 20001—knowledge that an accident has occurred—is

satisfied only with proof of *actual* knowledge on the part of the driver. Thus, defendant argues, the instruction given was defective because it permitted the jury to convict on the basis that defendant merely had imputed or constructive knowledge. Defendant further argues that it was misconduct for the prosecutor to use the theory of imputed knowledge based on evidence of defendant's conduct after the accident. Lastly, defendant contends that it was error to sentence him on the great bodily injury enhancement, even when the sentence imposed on the enhancement was stayed, because the governing statute prohibits enhancing a sentence in situations where great bodily injury is an element of the offense.

We reject all of these contentions and affirm the judgment in its entirety.

## BACKGROUND

About 9:00 p.m. on January 11, 2005, 55-year-old Gurdeep Kaur was dropped off on Moraga Boulevard, across the street from her home at 712 Moraga Boulevard. She was wearing a white sweater and black pants. Carrying a bag of vegetables and a container of soup from the restaurant where she worked, Ms. Kaur started to cross the road. She was not in a crosswalk or designated pedestrian pathway.[1]

Eileen Tarrab, a resident of Moraga for 13 years, was driving on Moraga Boulevard when she was startled to see Ms. Kaur in the lanes for traffic. In fact, Ms. Tarrab barely avoided hitting Ms. Kaur, who made no attempt to get out of the way. Ms. Tarrab described Ms. Kaur as "resolute, on a mission. . . . [S]he just seemed like she knew what she was doing." Seeing two vehicles approaching in the two oncoming lanes Ms. Kaur still had to cross, Ms. Tarrab wondered, "Is she going to make it?" Ms. Tarrab then heard a "horrific . . . whomp" noise, but she concluded, "Oh, that couldn't have been her, because I didn't think a human would make that sound." Looking back in her rearview mirror, Ms. Tarrab saw that "there were no brake lights. The cars kept going" away from her.

Returning to the scene 10 minutes later after completing an errand, Ms. Tarrab learned she was wrong—a human being could make that noise when struck by an automobile, even one that was not exceeding the speed limit.[2] Here, Ms. Kaur made that noise when she was struck by the Jaguar sedan being driven by defendant, hitting the windshield with enough force to fracture it, crumpling the hood and snapping off the metal leaping-jaguar hood ornament.

---

[1] The nearest crosswalk was 1,000 feet away.

[2] It appears to have been accepted by all concerned that defendant's car was travelling at a speed between 28 and 35 miles per hour. The posted speed limit was 35 miles per hour.

Moraga Boulevard where the accident occurred proceeds along a northwest-southeast axis. There are two traffic lanes in each direction, with a bicycle lane next to the curb on each side of the road.[3] The vicinity of the accident was a residential district, but the houses are secluded behind hedges and trees. The lanes are straight, and there are street lights. The lane in which defendant was traveling was rising slightly as he came towards Ms. Kaur.[4] After the accident, police found no skid marks.

When Ms. Tarrab returned from her errand, emergency personnel were already at the scene. Ms. Kaur was lying in the bicycle lane, still alive, but unresponsive to questions. She was quickly taken to a hospital, where she died within the hour. The coroner determined that the cause of death was "Multiple Blunt Force Injuries" produced by her having been struck by a moving automobile. Initially, possibly due to a red stain on one of the victim's shoes, the Moraga police announced that the suspected vehicle was a red or burgundy Jaguar built between 1995 and 2003.

Defendant's house was searched pursuant to warrant on January 27, 2005, the date defendant was arrested. Inside the closed garage, under a cover, the officers found defendant's black Jaguar. The vehicle was inspected and found to be mechanically sound, that is, there were no problems with the throttle, steering, or brakes. One of the earrings worn by Ms. Kaur was found in the windshield well of the Jaguar. The chief investigator concluded that the car had been cleaned, in part because of the "absence of the soup material that we expected would have been on what we found at the scene."

Police also seized defendant's computer during the search. A forensic computer expert testified that an examination of the computer's hard drive showed that on January 12, 2005, defendant did a computer search for the Moraga Police Department's Web page. Four days later, defendant made a Google search for "auto glass reporting requirements to law enforcement," and downloaded a Web site for "auto accidents and the law." That same day he made searches for "auto glass, Las Vegas" and "numerous" searches related to auto parts. The expert also found that on January 21 defendant

---

[3] Although several witnesses characterized the outer lane as a bicycle lane, to judge from a photograph introduced by the defense, it is commonly occupied by parked vehicles.

[4] According to testimony and several maps received in evidence at the trial, defendant was driving southbound in the lane next to the bicycle lane toward a streetlight when he struck Ms. Kaur. The actual point of impact was estimated to be approximately 120 feet from the light. In other words, Ms. Kaur was between defendant's car and the light. By contrast, Ms. Tarrab was driving northbound and had already driven past the light, which may account for Ms. Tarrab not seeing Ms. Kaur until it was almost too late to avoid hitting her.

made a search for "hit-and-run," which showed an entry for one site "dealing with the Moraga . . . hit-and-run there, and they had a lead and they were talking about the vehicle that they were looking for."

The day after defendant was arrested, his sister, Lynn Schmidt, came out to California from Indiana to lend assistance to defendant's wife and son. Defendant told her that he was driving through Moraga because he was going to meet a friend at a college basketball game in Moraga when he was involved in what he called "an accident." Ms. Schmidt testified to the ensuing conversation: "I asked him if he thought he had hit someone. And he said he thought he had hit a deer. And I said to him, 'Well, did you get out and did you look, did you see if you had any damage to your car?' [¶] I guess that would be my—if I hit something, you would stop and you would look to see what they did. And he said, no, he did not stop." She asked if he had reported the incident to law enforcement authorities; he replied he had not.

Ms. Schmidt further testified that "Initially I believed him," but "as time went on things didn't come all together." Eventually, in the fall of 2006, these nagging doubts led her to contact local police. "It was very difficult to make a call against my brother, but I felt that it was the right thing to do." She described herself as being troubled by defendant's "lack of remorse for what had happened," and his refusal to "come and talk to the police."[5]

Defendant testified that on the day of the accident he had a long business meeting at two restaurant-bars at Larkspur Landing in Marin County. During the course of the almost seven-hour meeting, defendant drank a single glass of beer and two glasses of wine. About 7:15 p.m., defendant left because he was to meet a friend and watch a basketball game at St. Mary's College of California. When he arrived at the St. Mary's campus and was unable to find a parking space, he decided to drive home to Oakland.

This is how defendant described what happened: "I was traveling south on Moraga Road . . . when there was this big large mass of [sic] 'Boom!' [¶] . . . [¶] The first thing I heard was the explosion. [¶] . . . [¶] I heard it, and I heard something hit the windshield and then it was gone. [¶] . . . [¶] . . . And my first reaction was, 'My gosh, what was that?' [¶] And I applied my brakes, and I pulled over as soon as I could find a place that was along the bike

---

[5] However, Ms. Schmidt did not notify the Moraga police until six months after the conclusion of a civil suit she had commenced against defendant concerning their joint ownership of property in Michigan. The lawsuit was commenced in September 2005. When she did talk with the Moraga police, the sister told them that defendant had told her, "I stopped, but did not get out to look" after the accident.

lane . . . so I could stop the car." "So I pulled over and I immediately got out of the car. . . . And I looked . . . down the road, I looked immediately northbound, because I knew whatever had struck the car was large. I had no idea at the time what it was. God forbid that it was a person. Whether it was a large animal or . . . not . . . I didn't know."

Defendant further testified that "when I didn't see anything there," he inspected the condition of his vehicle. He discerned that the windshield had been "damaged," and found "some indentations in the front of the hood" on his Jaguar. "I walked back towards where I thought the area of impact was. [¶] . . . [¶] I was looking for any kind of large—I mean, I knew it wasn't a stone that had been thrown up by the cars in front of me. So I was looking for some large animal."

"I didn't see anything. So I hadn't concluded anything other than the fact that what had hit the car, I couldn't see." As he was walking back towards his car, defendant saw a crosswalk. He testified what this meant to him: "I mean, at the time I couldn't conclude what it was; but I assumed at that point that because the crosswalk was positioned where it was and that . . . if there had been a person, okay, because I didn't know whether it was a person or whether it was a large animal, or what it was. [¶] If it had been a person, they would have been down there in the crosswalk." Having excluded the possibility of having hit a garbage can, defendant concluded, "it most probably was a deer and that it had scampered off."[6] Back in his car, defendant drove home.

Once home, defendant inspected the damage to his car, and made a couple of telephone calls. The following morning, defendant made another inspection of the damage to his car. He also heard a radio report about an accident in Moraga, which he thought "very coincidental." A visit to the Town of Moraga's Web site reassured him because it said they were looking for a red or maroon Jaguar. Defendant believed, "I thought I had done the investigation that I thought I should have done."

But defendant became more concerned as days passed, wondering, "Could I possibly have been involved in this?" Defendant was back east for a business trip from January 18th to the 21st. When he returned, he resumed his Internet roaming, looking for more information about "the Moraga hit-and-run case."

---

[6] Defendant testified that he had hit a deer 20 years ago in Michigan.

The prosecutor landed some heavy blows on cross-examination. He got defendant to admit that he was mistaken about the location of the impact: defendant believed it was four houses to the south of where Ms. Kaur was actually hit. Defendant also admitted he did not actually see a deer. And the prosecutor cast considerable doubt on defendant's testimony that he did not notice the crosswalk until after he had stopped his car and walked 150 to 225 feet back towards the presumed scene of the accident. The nearest crosswalk was 1,000 feet away (see fn. 1, *ante*), a distance so great it does not even appear on the very large aerial map used throughout the trial. Yet, defendant testified, he stopped within "seconds" of the impact, and within 500 feet. Despite seeing the crosswalk as he walked back, defendant denied that it occurred to him that "there could be pedestrians in that general area": "Not walking around at night, no." Defendant testified that he walked for several minutes and estimated that he went 300 feet before turning back to his car. Yet, to judge by the aerial map, it is a far greater distance from where defendant said he parked, to where he indicated he turned back.

Defendant conceded that, notwithstanding his misgivings, he never contacted Moraga police. Defendant had no recollection of making many of the Internet searches recorded on his computer. He did recall the search for a glass shop to replace his windshield, but this was because the Jaguar agency he used did not do body work, and because he wanted to make sure he did not become involved in anything "covert" that would reflect adversely on "my level of responsibility" in retrospect.

An accident reconstruction expert testified for the defense. The primary point of his testimony was that defendant may not have seen Ms. Kaur in time to avoid hitting her. That testimony need not be summarized here because it is not germane to the legal issues advanced by defendant on appeal. However, one part of the expert's testimony is relevant. He testified that he visited the scene with defendant sometime prior to March 2007, the date of his report. Defendant showed the expert a spot more than 400 feet past the accident scene where defendant said he had stopped, turned on his emergency flashing lights, left his car, and walked back "to try to determine what it was that he had collided with. [¶] During the course of the conversation, he told me that he knew there were deer in the area and he could only surmise that he must have struck a deer." Defendant showed the expert that he walked back to a point about 150 to 200 feet from where he stopped, Defendant told the expert he came to this point, "looked around, saw nothing, heard nothing, and returned to the vehicle." Asked by the prosecutor, "Did you get all the way back to the area of impact?," the expert answered, "Not even close."

The prosecution landed further blows on rebuttal. The lead investigator, who was at the scene on the night of January 11, testified that there were not so many cars parked in the bike lane that defendant had to park as far away as he did; in other words, defendant could have stopped his car a lot sooner than he did. Two witnesses testified that people had stopped at the scene within two minutes of Ms. Kaur's being struck. Not only had these Good Samaritans parked very close to the scene, they remained there until after police arrived. Thus, had defendant actually walked as far as he testified he did, they would have been visible to him. Two employees of St. Mary's College testified, contrary to defendant's testimony, that there were plenty of parking spaces on the evening of January 11.[7]

Also on rebuttal, the lead investigator for the Moraga Police Department testified in effect that Ms. Kaur's body would have been visible from the 400-foot point where defendant said he stopped his car, and "easily" visible from the 200-feet spot where defendant testified he stopped walking because he saw nothing. A motorist who called 911 testified that she stopped because she "saw something 'white' " off on the side of the road. She further testified that she saw no Jaguar or other car with emergency lights flashing. Another driver testified to making a U-turn on Moraga Boulevard at about the time and place defendant said he had stopped his car, but this driver also saw no Jaguar or other car with flashing emergency lights.

At sentencing the trial court excoriated defendant for his "very shameful display of contrived testimony" about hitting a deer, and his "totally illogical" claim that he did not know he had hit a person. After denouncing defendant

---

[7] A considerable amount of attention was paid to the issue of whether defendant was legally intoxicated at the time, but it was inconclusive. Indeed, the manager of the second bar at Larkspur Landing testified that defendant, who was apparently by himself, was belligerent and literally falling down drunk. The manager was so concerned that he stopped defendant from driving off and insisted he drink some coffee. After doing so, and refusing the manager's offer to call a taxi, defendant left. The manager was still so concerned that he notified the police department for Larkspur-Corte Madera, and entered a report of the incident "with a very drunk person" in the restaurant's daily log. On the other hand, the manager was utterly imprecise as to the time of defendant's departure. Plus, the manager's supervisor, who was working on January 11, had no recollection of these events.

A forensic toxicologist testified for the defense that, if defendant drank no more than the one beer and two glasses of wine that he said he did, when he did, his blood-alcohol level at 9:00 p.m. would have been "zero." However, if defendant consumed all of the drinks he paid for (as shown by credit card receipts), his blood-alcohol level would have been 0.16. On the other hand, the man who was with defendant during the seven-hour meeting testified that defendant did, as he testified, consume only what he said he did, and no more. Both he and defendant left together about 7:15 p.m., at which point defendant was not under the influence. But this person could not swear that defendant actually drove off at that time, or that defendant did not return to the second bar.

The prosecutor told the jury in closing argument that the subject of defendant's alcohol consumption was relevant to defendant's "perception and ability to recall."

for his "display of arrogance and self-absorption . . . while you were on the stand," the trial court denied probation[8] and then stated that the real "struggle[]" was "whether or not I . . . impose the aggravating term. . . . It is a very tempting alternative to impose the aggravated term." The trial court sentenced defendant to state prison for the middle term of three years for the violation of section 20001, with an identical term for the great bodily injury enhancement, but the latter was stayed pursuant to Penal Code section 654.

## DISCUSSION

### Defendant Was Properly Convicted on the Basis of Constructive Knowledge That He Had Been in an Accident

■ Defendant's principal contention proceeds as follows: Section 20001 has two components of the knowledge requirement, specifically, knowledge that "another person is *involved* in the accident" and knowledge that "the other person is *injured*." Defendant accepts that with the following language in *Holford* the Supreme Court held that " 'constructive knowledge of injury' is sufficient to support a conviction": "[T]he driver who leaves the scene of the accident seldom possesses actual knowledge of injury; by leaving the scene he forecloses any opportunity to acquire such actual knowledge. Hence a requirement of actual knowledge of injury would realistically render the statute useless. We therefore believe that criminal liability attaches to a driver who knowingly leaves the scene of an accident if he actually knew of the injury or if he knew that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person." (*Holford, supra,* 63 Cal.2d 74, 80.)[9]

---

[8] One of the reasons the court declined to admit defendant to probation was that only two months before hitting Ms. Kaur defendant had completed probation for one of his three convictions for driving while intoxicated. The jury did not learn of this part of defendant's history. It also did not hear that defendant had given a $30,000 check to a criminal defense attorney the day after the accident, when defendant became aware that he was already under police surveillance at his home.

[9] In the wake of *Holford*, CALJIC No. 12.70 instructs a jury what must be done by "Every person who as the driver of any vehicle is knowingly involved in an accident resulting in the death of or injury to any person other than himself." CALJIC No. 12.70 tells the jury that "The word 'knowingly' means that the driver of the vehicle involved knew that an accident occurred, knew that he was involved in the accident and either knew that the accident resulted in injury to or death of a person and knew that it was of such a nature that it was probable that it resulted in injury or death." The instruction reiterates these points by telling the jury that two of the elements required for conviction under section 20001 are "1. A person while driving a motor vehicle was involved in an accident resulting in injury to another person; [¶] 2. That person knew that an accident had occurred, knew that he was involved in the accident and either knew that the other person had been injured or that from the nature of the accident it was probable that another person had been injured."

However, defendant goes on, "the expansion of the 'actual knowledge' element to include 'constructive knowledge' appears only in the context of cases where there is no question that the defendant knew another person was involved in the accident—the question was knowledge of the victim's injuries." Therefore, defendant concludes, section 20001 cannot be construed "to impose criminal liability upon a party not proven even to have known with certainty that the accident involved another person. In [this] circumstance, the jury must find that the defendant actually knew that another person was involved." Moreover, the accused must be in possession of that knowledge by the time he or she leaves the scene of the accident.

Defendant appears to believe that no conviction is proper unless the driver is shown to have actual knowledge of having been involved in an accident that resulted in injury to a person. Defendant is wrong.

■ Courts have accepted that the driver charged with violating section 20001 must be shown to have had knowledge of a collision with a person. (*People v. Hamilton* (1978) 80 Cal.App.3d 124 132 [145 Cal.Rptr. 429]; *Garabedian v. Superior Court* (1963) 59 Cal.2d 124, 127 [28 Cal.Rptr. 318, 378 P.2d 590] [ordering dismissal of prosecution for lack of proof "of an essential element of the crime . . . to-wit, knowledge on [the defendant's] part that an accident had occurred"]; *People v. Scofield* (1928) 203 Cal. 703, 711 [265 P. 914] ["it is inconceivable that the Legislature intended to make the provision of the section applicable . . . to a person who was ignorant of the fact that the automobile which he was driving had struck another person"]; *People v. McKee* (1926) 80 Cal.App. 200, 206 [251 P. 675]; *People v. Graves* (1925) 74 Cal.App. 415, 417 [240 P. 1019] ["it is with equal difficulty that we can bring our minds to believe that any jury would convict . . . without being assured to a certainty that he had actual knowledge that his machine had struck a person, or had collided with another automobile . . ."]; *People v. Huber* (1923) 64 Cal.App. 352, 356 [221 P. 695]; *People v. Fodera* (1917) 33 Cal.App. 8, 14 [164 P. 22].)

But the driver's simple denial of such knowledge has never been treated as compelling acquittal. (*People v. Wolf* (1978) 78 Cal.App.3d 735, 739 [144 Cal.Rptr. 344]; *People v. Kuhn* (1956) 139 Cal.App.2d 109, 112–113 [292 P.2d 964].) Claimed ignorance of any accident has been repeatedly rejected in the face of countervailing evidence, as illustrated by numerous decisions affirming convictions where such claims failed to persuade the trier of fact. (E.g., *People v. Kuhn, supra*, at pp. 111–112 [defendant testified "he felt a bump or jar"; "It is not to be always concluded that because the defendant disclaims

he was aware he struck and injured another person he lacked such knowledge."]; *People v. Dallas* (1941) 42 Cal.App.2d 596, 600 [109 P.2d 409] [defendant "claimed he did not see the pedestrian . . . did feel a dull thud and heard the crashing of glass . . . and . . . wondered what they had hit"]; *People v. Pahner* (1935) 10 Cal.App.2d 294, 297 [51 P.2d 1143] [defendant testified "he had no knowledge of having hit or injured anyone"]; *People v. Leutholtz* (1929) 102 Cal.App. 493, 497 [283 P. 292] [defendant "swore that he saw no person . . . as he drove"]; *People v. Libhart* (1926) 79 Cal.App. 291, 292 [249 P. 211] [defendant " 'said he didn't think he ran into a human being' "]; *People v. Fodera, supra,* 33 Cal.App. 8, 10 [defendant "insisted . . . that he did not know of the collision at the time of its occurrence"]; see also *People v. Graves, supra,* 74 Cal.App. 415, 419 ["It is true appellant testified that he did not know that the machine had struck Fraser, but we can hardly see how this was probable."].)

The flaw in defendant's reasoning was exposed more than 70 years ago, in *People v. Henry* (1937) 23 Cal.App.2d 155, 159–160 [72 P.2d 915], with language dispositive of defendant's position here: "It is pointed out that the offense of failing to stop and render assistance is not made out unless it is shown that the person accused of the offense actually knew that the automobile which he was driving had struck someone. It is next observed that the defendant's testimony that he had no recollection of anything that occurred . . . was not contradicted. The third step in this argument is that, since the defendant's testimony is uncontradicted, the necessary element of knowledge was not proven, hence the jury's verdict of guilt is not supported by the evidence and the judgment which was rendered in conformity with the verdict must be reversed.

"With respect to the contention thus ingeniously presented it may be remarked that the defendant's testimony was not directly rebutted nor contradicted for the obvious reason that it could not be. The defendant was alone and is the only person who could state whether or not he actually knew that the automobile which he was driving had been involved in an accident. However, it cannot be the law that, because the driver of an automobile declares that he has no recollection of anything that may have taken place for an interval of time during which the circumstantial evidence overwhelmingly indicates that his automobile was involved in an accident whereby another person was injured or killed, the matter must be considered determined by such testimony. If such were the rule [section 20001] is nullified for all practical purposes. The jury was not, however, bound to accept as true the defendant's statement in the face of the extensive damage which the evidence showed his automobile had sustained . . . and which the evidence showed was

the automobile which the defendant was driving. That the defendant did not know that he had struck a human being is inconceivable in view of the above facts which were developed by the evidence. [Citation.] . . . [T]he jury may well have concluded that the defense . . . was conveniently fabricated for the express purpose of avoiding the penalty which the law might impose by way of punishment for his dereliction. Under all the facts and circumstances disclosed by the record we are not prepared to announce that such a conclusion was improper."

There is no reason to believe that the cogency of this reasoning has been diminished by the passage of the years. There must be proof—obviously most likely, perhaps exclusively, to be shown by circumstantial evidence—that the defendant was aware of being involved in an accident. But there is no reason in logic or in law why this knowledge can only come from the defendant's lips. In other words, just as knowledge of injury can be constructively established, there is no reason why a similar rule does not apply to knowledge that the accident or collision involved a person. As one of the authorities cited by defendant states, "Of course, knowledge, like other facts, may be proved by circumstantial evidence . . . ." (*People v. Mayo* (1961) 194 Cal.App.2d 527, 535 [15 Cal.Rptr. 366].) If knowledge of the seriousness of injury can be imputed, knowledge of the involvement of a person would appear to be an even more elemental conclusion that a trier of fact is entitled to draw. Defendant presents no argument as to why the former deduction is to be entrusted to the trier of fact, but the latter deduction is to be withheld. Nothing in *Holford* is to the contrary.

It is notable that a number of decisions look to the actual circumstances of the accident, and that in one particular case the circumstances bear more than a passing resemblance to what happened on Moraga Boulevard.[10] That case is *People v. Dallas, supra,* 42 Cal.App.2d 596, where the defendant driver "had been . . . drinking . . . although there is no evidence that . . . [he was] intoxicated." Bystanders "heard a 'sickening thud' when the pedestrian was struck." The front of the vehicle sustained appreciable damage. The defendant and others in the vehicle "admitted they felt the thud when the machine came in contact with the body of the pedestrian. They knew they had struck some object for they . . . returned to the scene . . . . It seems impossible that the defendant and his companions could have failed to see the body of the

---

[10] One thing that is not considered is whether the pedestrian was at fault or contributed to causing the accident. (See, e.g., *People v. Scofield, supra,* 203 Cal. 703, 708; *People v. Leutholtz, supra,* 102 Cal.App. 493, 498–499; *People v. Graves, supra,* 74 Cal.App. 415, 417 [approving instruction that "it is immaterial whether such accident was caused by the . . . carelessness of the person struck . . . or was an unavoidable accident"].)

deceased as it was hurled over the hood of their machine. The force of the blow, the sound of the contact with the body, the . . . sight of the form as it was thrown over the hood of their machine . . . must have warned them of the nature of the accident." (*Id.* at pp. 601–602.)

■ A pedestrian struck with sufficient force that he or she reaches the hood or windshield is treated as virtually unignorable. (E.g., *People v. Kuhn, supra,* 139 Cal.App.2d 109, 112 ["the path of the injured man's body . . . renders it unlikely that the defendant was ignorant of the object which he hit"]; *People v. Dallas, supra,* 42 Cal.App.2d at p. 601.) The extent of damage to the defendant's vehicle is routinely treated as particularly probative. (E.g., *People v. Wolf, supra,* 78 Cal.App.3d 735, 738 [dented hood and cracked windshield]; *People v. Forthun* (1940) 40 Cal.App.2d 656, 659 [105 P.2d 378] [smashed fender and dented hood]; *People v. Henry, supra,* 23 Cal.App.2d 155, 158 [headlight, license plate, hood, fender, and sides of car dented]; *People v. Rallo* (1931) 119 Cal.App. 393, 399 [6 P.2d 516] [broken bumper and damaged headlight]; *People v. Fodera, supra,* 33 Cal.App. 8, 10 [fenders and tool box "bent and indented"].) A collision with the speed and force to cause death invariably draws comment. (E.g., *People v. McKee, supra,* 80 Cal.App. 200, 206 ["It is inconceivable that the jury could have believed that defendant struck the deceased with such force as to instantly kill her and not have known that he had struck something . . . ."]; cf. *People v. Libhart, supra,* 79 Cal.App. 291, 293 ["The man who was struck was thrown with such force as to seriously injure and render him unconscious, and it is highly improbable that the defendant did not know that he had struck the man."]; *People v. Dallas, supra,* at p. 601.)

■ Nor was the jury prohibited from considering defendant's conduct after his Jaguar collided with the victim. (See *People v. Mosley* (1961) 197 Cal.App.2d 513, 516 [17 Cal.Rptr. 341] [affirming conviction of "one who drives an automobile and strikes down a pedestrian . . . , drives a block away thereafter, stops and backs up part way to the scene of the impact"]; *People v. Huber, supra,* 64 Cal.App. 352, 353 [affirming conviction where "After knocking down Begley, the defendant continued on his course for some little distance . . . . After stopping his machine the defendant merely looked back and then drove on."].) Indeed, as here, postaccident behavior can be treated as sufficiently egregious to justify giving a flight instruction. (See *People v. Ryan* (1981) 116 Cal.App.3d 168, 180–181 [171 Cal.Rptr. 854].) The obvious point is that a consciousness of guilt is based upon preexisting information, which in this case would be the knowledge defendant had when he drove away from the 700 block of Moraga Boulevard.

Although defendant does not claim that the evidence was insufficient to support the verdict, it is appropriate to take note of just how substantial it

was. First of all, defendant does not dispute that he was driving his Jaguar and that he did in fact hit Ms. Kaur. Second, it is irrelevant to this prosecution that Ms. Kaur's walking across Moraga Boulevard in the manner she did may have contributed to the accident. (See fn. 10, *ante*.) Third, there is no dispute that Ms. Kaur's injuries were of a magnitude that would require defendant to stop and comply with Vehicle Code section 20003. All defendant disputes is whether the prosecution presented adequate proof that he knew, or should have known, that the object that came into contact with his vehicle was a human being. It clearly was.

There was no evidence that defendant's Jaguar collided with another vehicle. Although defendant raised the possibility that he might have struck a garbage container set out for collection, there is no evidence that such a container was in a lane of traffic or was hit. All defendant is left with is his suspicion that he may have hit a deer. But defendant admitted he did not actually see a deer. And there was no evidence that defendant had personal knowledge of deer in the area. All he had was the memory of having hit a deer 20 years ago, in Michigan, in broad daylight. On the other hand, there was evidence that deer did not frequent the area. In sum, the jury could deduce that the only deer was the one in defendant's hopeful imagination.

And there was evidence that defendant had hit something substantial. No attempt to dismiss it would be credible. Whatever defendant hit, it caused considerable damage to the front of his vehicle, ripped off the hood ornament, and destroyed the windshield. Startled as she was, Ms. Tarrab realized it was a human being she had almost hit, so it is hard to credit that at an even closer distance, and in better light, defendant would not have had the same realization. But the most devastating evidence was defendant's own guarded admission that he entertained the thought that he had hit a human being. Even at night, that would be the most natural thought in a residential district. The fact that defendant purported to stop and inspect is confirmatory. We say "purported" because there is considerable scope for doubting that events occurred as defendant testified.[11] The proof that he said he stopped as far away as he did belies his testimony that he pulled over immediately. Given

---

[11] The prosecutor argued to the jury that there was strong reason to believe that defendant did not stop but simply panicked and drove on: "A person was probably injured. The car was smashed up, the window [had] substantial damage. He didn't hit a pigeon, he hit something big. And the second you see that pedestrian sign you see that house next to you, your heart drops. 'Oh, God, what happened?' But you have to know, and he knew and he fled. [¶] And certainly by the point of the next day where he hears about an accident at the same time, at the same place involving a Jaguar, there can be no doubt he knew it was probable. He hit a human being, and he started to do everything he could to avoid responsibility for this crime. [¶] I'll remind you that he's had two years and three months to think about what he's going to say to you, two years and three months since he first started researching on his computer auto accidents and the law."

his distance, by the time he would have retraced his path to where he thought—mistakenly—the accident occurred, the group of concerned persons had already congregated. His testimony that he saw none of this comes close to being so lacking in credibility that one may hold the belief that he made no such effort. Such disbelief may have been behind the trial court's opinion of defendant's testimony. As for defendant's conduct once he reached his home, i.e. the Internet searches, it is conclusive that his suspicion lingered and would not go away.

■ As already noted, the jury was entitled to reject defendant's testimony as to his state of mind. (*People v. Wolf, supra,* 78 Cal.App.3d 735, 739; *People v. Kuhn, supra,* 139 Cal.App.2d 109, 112–113; *People v. Pahner, supra,* 10 Cal.App.2d 294, 297.) In light of the entirety of the circumstances, we conclude there was abundant evidence from which the jury could conclude that defendant did indeed have knowledge—actual or constructive—that he had collided with a human being on the evening of January 11, 2005, on Moraga Boulevard.

With the failure of this, the foundation of defendant's contention, the edifice he constructs on that foundation quickly collapses. CALJIC No. 12.70, based upon *Holford,* was an accurate and correct statement of the law, so defendant's claim of error in giving it fails.[12] Because defendant's Internet searches after January 11 are inextricably linked to his state of knowledge on January 11, they were an appropriate subject for argument by the prosecutor—and not misconduct.[13]

### Defendant Was Properly Convicted and Sentenced for the Great Bodily Injury Enhancement

Over objection by the defense that separate sentences could not be imposed for violating section 20001 and for the great bodily injury enhancement

---

The prosecutor also told the jury: "And I think what he did afterwards is extremely telling, also, the computer searches and Web pages. Auto parts, auto dealers out-of-state; Auto Glass, Las Vegas; auto glass reporting requirements to law enforcement, auto theft . . . . [¶] The defendant didn't offer you any explanation for the auto theft, one, and he had a series of excuses for the other ones. But when you put them all together, the only reasonable conclusion was he was going to try to get the car fixed somewhere else far away so he wouldn't be found out, he was going to try and avoid having anything reported to law enforcement. [¶] . . . [¶] And the one that's particularly absurd is auto glass reporting requirements to law enforcement where he's saying this guy who ran, left her for dead and hid his car away . . . , that he wanted to play by the book and play by the rules and make sure that when he got the window fixed it was correctly reported or done right, whatever he said at that point was just absurd[]."

[12] Indeed, CALJIC No. 12.70 could be read to defendant's advantage because it tells the jury no fewer than three times that a defendant must know that an accident occurred. This is much more susceptible to a construction of actual knowledge.

[13] We note that none of the prosecutor's argument already quoted (see fn. 11, *ante*) elicited an objection by the defense.

authorized by Penal Code section 12022.7, the trial court imposed the middle term of three years for the substantive offense and the three-year term specified for the enhancement, but staying the latter pursuant to Penal Code section 654. Defendant contends that the enhancement "cannot apply" because subdivision (g) of Penal Code section 12022.7 expressly states that it "shall not apply if infliction of great bodily injury is an element of the offense." We do not agree.

"The gravamen of a section 20001 offense . . . is not the initial injury of the victim, but leaving the scene without presenting identification or rendering aid." (*People v. Escobar* (1991) 235 Cal.App.3d 1504, 1509 [1 Cal.Rptr.2d 579].) Section 20001 governs a number of situations, one of which is automobile accidents resulting in death. Clearly, not rendering aid to a dead person (assuming death has already occurred) is not by itself what is criminalized by the statute. Section 20001, with its incorporation by reference of section 20003, criminalizes a number of obligations a person involved in an accident is required, if feasible or necessary, to do: (1) stop, (2) identify themselves, any injured passengers, and vehicle registration, (3) render aid, and (4) provide transportation for an injured person. (See *People v. Steele* (1929) 100 Cal.App. 639, 645 [280 P. 999].) Clearly, not rendering aid to a dead person (assuming death has not already occurred) is not the sole omission which can result in a violation of section 20001. Defendant is therefore incorrect in concluding "Penal Code section 12022.7(a) cannot apply because Appellant's felonious conduct was in failing to render aid, and no evidence was introduced indicating that this action contributed to Mrs. Kaur's injuries."

Moreover, a person can violate section 20001 even when not driving. (See *Holford, supra*, 63 Cal.2d 74, 81–82, and decisions cited.) But Penal Code section 12022.7 operates only as to those who *personally* inflict great bodily injury. There is no comparable requirement in section 20001. The prohibition in Penal Code section 12022.7, subdivision (g) does not govern because the personal infliction of great bodily injury is not an element of section 20001. The respective spheres of the two statutes operation may overlap, yet they are far from coextensive. When they do overlap, as occurred here, Penal Code section 654 becomes operative. Conviction for both is proper, and imposition of separate sentences for each is proper. But actual punishment, i.e., service of those separate sentences, is not. The appropriate course, the one used by the trial court here, is to stay execution of the sentences. (E.g., *People v. Sloan* (2007) 42 Cal.4th 110, 116 [64 Cal.Rptr.3d 137, 164 P.3d 568].) There was no error.

## DISPOSITION

The judgment of conviction is affirmed.

Haerle, Acting P. J., and Lambden, J., concurred.