Filed 2/10/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ABSADI TEWELDE KIDANE,<br><br>    Defendant and Appellant. | B303213<br><br>(Los Angeles County<br> Super. Ct. No. SA095262) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Lauren Weis Birnstein, Judge.  Affirmed.

Cynthia L. Barnes, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott Taryle and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

A jury found defendant and appellant Absadi Tewelde Kidane guilty of gross vehicular manslaughter while intoxicated and resisting arrest and found true the allegation that defendant fled the scene of the accident. He contends there is insufficient evidence supporting the vehicular manslaughter conviction and the true finding on the special allegation. Defendant also argues the trial court erred in imposing an upper term sentence and his trial counsel was ineffective in failing to object to the court's reliance on factually unsupported aggravating factors.

We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On the afternoon of March 21, 2017, defendant sped through the parking lot of the Los Angeles Superior Court in Santa Monica, fatally striking Donald Thomas, Jr., before finally coming to a stop after crashing into a parked car on Main Street. Defendant fled the scene on foot. He was charged with gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a); count 1), vehicular manslaughter (Pen. Code, § 192, subd. (c)(1); count 2) and resisting an executive officer (Pen. Code, § 69; count 3). It was alleged as to counts 1 and 2 that defendant fled the scene of the accident (Veh. Code, § 20001, subd. (c)). The testimony at trial established the following material facts.

Around 3:30 p.m. on March 21, 2017, William Caneda Rathje, a security guard for the RAND Corporation, was at his post on the east side of the RAND property bordering Main Street, looking east toward the courthouse. There was a lot of vehicle and pedestrian traffic at the time with people leaving the courthouse and students getting off from the nearby high school. Mr. Rathje noticed a car traveling at "a very high rate of speed" through the courthouse parking lot. The car was heading

2

westbound through the parking lot. It rammed through a control arm parking gate and headed toward the car port shelters under which were several self-pay ticket machines. The car hit one of the ticket machines and became "airborne." The car continued westward over an area of grass, the sidewalk and then onto Main Street, finally coming to a stop after crashing into a car parked on the west side of Main Street in front of the RAND building.

Mr. Rathje saw a man in a red shirt get out of the car and start running south down Main Street. The man ran to the intersection with Pico Boulevard, turned left and disappeared from view. Sometime later, Mr. Rathje saw an officer performing CPR on a man lying in the street. From his vantage point on the RAND property, Mr. Rathje had not seen the car strike the man.

Syniah R. was walking home from school that afternoon. She left the Santa Monica High School campus, walked through the courthouse parking lot and was crossing to the west side of Main Street when she heard a loud noise. She turned around and saw a "body flying" through the air and a gray car going "at a rapid pace" across Main Street from the grassy area bordering the parking lot. It came to a stop after crashing into a parked car. At some point thereafter, she saw a man wearing a red hoodie walking quickly away from the crashed car, heading toward Pico Boulevard.

From the window in her office at the RAND Corporation, Terresa Cooper saw a car speeding through the courthouse parking lot. The car struck a man near the ticket machines, throwing him into the air. He landed in the street near the curb.

Juan Cozzarelli, a security guard, was screening visitors at the front entrance of the courthouse. He heard the crash and ran outside. Mr. Cozzarelli saw a man lying face down and

3

motionless near the curb, bleeding profusely. He yelled for a coworker to call 911. He then walked across Main Street to check on the driver of the crashed car. A small crowd had started to gather around the car. The driver's eyes were closed. The airbags were deployed and the driver's side door was open. Mr. Cozzarelli checked the driver's pulse which was rapid.

Mr. Cozzarelli's supervisor arrived on the scene and asked him to perform traffic control. Shortly thereafter, Mr. Cozzarelli heard people yelling "he's fleeing." He turned and saw the driver running down Main Street toward Pico Boulevard. Mr. Cozzarelli yelled to another officer that the driver was running away. Mr. Cozzarelli ran after the man, repeatedly yelling for him to stop to no avail. Mr. Cozzarelli continued chasing the man down Main Street and then eastbound on Pico Boulevard until several patrol cars arrived and the responding police officers apprehended the driver.

Santa Monica Police Officer Andrew Sanchez was one of the responding officers. He saw defendant, wearing a red shirt and white shorts, running down Pico Boulevard being pursued by another patrol car using lights and siren and broadcasting a command to stop from its PA system. After a brief pursuit, Officer Sanchez was able to catch up to defendant and tackle him to the ground. Defendant kicked and "thrash[ed]" for a time before several of the officers were able to place handcuffs on him and a hobble around his ankles.

Santa Monica Police Officer Evan Raleigh, a certified drug recognition expert, arrived on scene and attempted to evaluate defendant. Defendant was evasive, averting his eyes and putting his chin down to his chest. Before defendant looked away, Officer Raleigh saw that defendant's eyes were "bloodshot and watery"

4

and his pupils were "slightly dilated." Officer Raleigh also noticed other signs indicative of someone under the influence of a controlled substance, including dried debris in the corners of the mouth (resulting from saliva production being inhibited), repeated licking of the lips, grayish lip color and a rapid heart rate.

Before defendant was taken to the police station, both Mr. Rathje and Mr. Cozzarelli were brought over to make a field identification. Both identified defendant as the man in the red shirt who got out of the crashed car. Defendant refused to stand up for the identification procedure.

After defendant arrived at the police station, Officer Raleigh again tried to evaluate him. He saw that defendant exhibited additional symptoms characteristic of someone under the influence of marijuana, including "eyelid flutters" (rapid eye movement when eyes are closed), periodic body tremors (similar to shivering) and a fluctuating respiration rate. Defendant's blood was drawn pursuant to a warrant to determine whether he was under the influence of any drug.

After charges were filed, defendant moved for mental health diversion pursuant to Penal Code section 1001.36. The motion was denied. Thereafter, defendant entered a plea of not guilty by reason of insanity. (§ 1017.)

Trial by jury proceeded in August 2019. In addition to the above evidence, the following additional facts were established.

During the investigation of the accident, surveillance video was obtained that captured a portion of the route driven by defendant through the parking lot, including when the car hit Mr. Thomas. The surveillance video and numerous photographs were shown to the jury. Footage from the body camera of one of

the officers who assisted in detaining defendant after the accident showed defendant telling the officers, "I just want to smoke some weed."

The investigation showed that defendant's car hit one of the control arms of the parking gate at the east side of the parking lot, ran into and dislodged two concrete-filled steel bollards and then collided with one of the self-pay ticket machines before continuing on into the street and into a parked car. Mr. Thomas had been standing near one of the ticket machines when he was struck by defendant. Mr. Thomas was thrown into the air, landing almost 90 feet away near the curb on the east side of Main Street. Damage to the driver's side windshield was in a "spiderweb" pattern consistent with Mr. Thomas's body hitting the windshield before being thrown into the air.

An autopsy confirmed Mr. Thomas died from multiple traumatic injuries.

An inspection of the "black box" data from defendant's car showed that just before the airbags deployed the car had been accelerating. At the point of impact, the car was traveling 53.4 miles per hour. The data also showed the brake pedal was not employed at any time during this period.

Ariana Adeva, a forensic toxicologist, testified about the effects of cannabis use on the human body, its impact on performing certain activities like driving, and defendant's test results. The blood sample taken from defendant approximately three hours after the accident showed the presence of 3.1 nanograms per milliliter of Delta-9 Tetrahydrocannabinol or THC, the psychoactive element in marijuana or cannabis that causes the "high" associated with its use. Approximately

6

75 percent of Delta-9 THC leaves the blood within two hours of use. The body eventually metabolizes Delta-9 THC into Carboxy THC and it can stay at detectable levels in the body for weeks after use. Defendant's blood showed 42.8 nanograms of Carboxy THC which is indicative of frequent use.

Ms. Adeva also offered her opinion based on a hypothetical that someone with defendant's test results and exhibiting similar symptoms and behavior was under the influence and would have been impaired.

Evidence was presented showing that defendant's social media accounts included many images related to marijuana use, as did texts on his cell phone which was recovered from his car. Carlos Silva, one of defendant's friends, said he knew defendant used marijuana, sometimes to get the "creative juices flowing" when he was working on his music.

Defendant presented the testimony of Dewayne Beckner, a forensic chemist. He testified there is no consensus in the scientific community regarding what concentration of marijuana will cause impairment. He stated his opinion that the level of Delta-9 THC reported in defendant's blood sample was too low to cause the erratic driving seen in the surveillance video.

Dr. Gordon Plotkin, a forensic psychiatrist, testified that he interviewed defendant and did not believe marijuana use was the cause of his behavior on the day of the incident. He said that defendant suffered from delusions and the onset of mental illness and experienced a psychotic break that day. Defendant also told him he was trying to kill himself by driving into a pole.

The prosecution presented rebuttal witnesses, including Dr. Joel Peel Leifer, a clinical psychologist who interviewed

defendant.  Dr. Leifer stated his opinion that defendant did not show any signs of suffering from any severe mental disorder.

The jury found defendant guilty of gross vehicular manslaughter while intoxicated and found true the allegation that defendant fled the scene of the accident within the meaning of Vehicle Code section 20001, subdivision (c).  The jury acquitted defendant of resisting an executive officer and guilty of the lesser included offense of misdemeanor resisting or obstructing a peace officer.

The sanity phase of the trial then proceeded in accordance with Penal Code section 1026, subdivision (a).  Defendant testified that in the months preceding the accident he dropped out of school, had trouble sleeping and began to feel paranoid.  He said he was using a lot of marijuana.  On the day of the accident, he said he wanted to kill himself and did not intend to hurt anyone else.  Dr. Plotkin testified again and restated his opinions about defendant's mental health.

The jury found defendant was sane at the time he committed the offenses.

The court imposed a 10-year upper term on count 1, plus a consecutive five-year term for the enhancement, and a concurrent jail term of 364 days on count 3 for a total sentence of 15 years in state prison.  The court awarded defendant 1,904 days of presentence custody credits and imposed various fines and fees.

This appeal followed.

## DISCUSSION

**1.    Substantial Evidence Supports the Jury's Verdict**

Defendant contends his vehicular manslaughter conviction and the fleeing the scene enhancement are unsupported by the factual record.  We are not persuaded.

It is well established that in resolving a question of substantial evidence in a criminal case, our role "is a limited one." (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)  "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)  "[W]e must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*Ibid*.)  It is not within the scope of our review to reweigh the evidence or to make determinations based on viewing isolated bits of evidence. "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*Ibid*.)

Defendant argues it was undisputed there was no evidence of marijuana in his car and his blood showed relatively low levels of the drug in his system.  However, we do not view this evidence in isolation.

The jury was instructed with CALCRIM No. 2110 which provides in relevant part that "[a] person is *under the influence* if,

9

as a result of taking a drug, his mental or physical abilities are so impaired that he is no longer able to drive a vehicle with the caution of a sober person, using ordinary care, under similar circumstances."

There was ample evidence establishing that defendant was under the influence. Defendant drove his car in an erratic and reckless manner through the courthouse parking lot, during a busy time of day, breaking through a parking gate arm and careening into two concrete-filled steel bollards and then into the ticket machine where Mr. Thomas was standing. At the time of his detention by police officers shortly after the accident defendant had bloodshot, watery eyes and his pupils were dilated. Officer Raleigh attested to additional facts regarding defendant's appearance and demeanor that were consistent with defendant being under the influence of marijuana, including body tremors, grayish lips and dry mouth. The prosecution's expert toxicologist, Ms. Adeva, attested to the level of THC in defendant's system. She explained that 75 percent of Delta-9 THC leaves the blood within two hours of use and defendant's blood draw was almost three hours after the accident. A reasonable inference could be drawn that defendant's THC levels were significantly higher at the time of the accident. Ms. Adeva also stated her opinion, based on a hypothetical framed from the factual record, that a person exhibiting similar symptoms and behavior would have been impaired. Further, there was evidence from defendant's social media accounts, cell phone and friends that he was a frequent user of marijuana.

As for the enhancement, defendant says the evidence showed that his car struck, in very quick succession, multiple stationary objects, any one of which may have triggered the

airbags to deploy, and there was no evidence he knew he had also hit and injured a person.

Constructive knowledge of injury satisfies the statute. "[C]riminal liability attaches to a driver who knowingly leaves the scene of an accident if he actually knew of the injury *or if he knew that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person.*" (*People v. Holford* (1965) 63 Cal.2d 74, 80, italics added; accord, *People v. Harbert* (2009) 170 Cal.App.4th 42, 52 (*Harbert*).)

The jury saw photographs of the scene and surveillance video which captured the violence of the incident. They heard testimony from multiple witnesses that defendant got out of his crashed vehicle just a few car lanes away from where Mr. Thomas's motionless body lay in the street and he took off running. They also heard that the shattered windshield on the driver's side of defendant's car was consistent with Mr. Thomas's body slamming into the windshield before being thrown into the air. The jury thus had ample evidence before it upon which to rest its determination that defendant knew, or reasonably should have known, he had struck and injured someone before fleeing the scene. "A pedestrian struck with sufficient force that he or she reaches the hood or windshield is treated as virtually unignorable." (*Harbert*, *supra*, 170 Cal.App.4th at p. 56.)

## 2. The Upper Term Sentence on Count 1

Defendant contends the trial court erred in imposing the upper term because the evidence did not support the aggravating factors relied upon by the court and the court disregarded defendant's mental health issues as a mitigating factor.

Defendant forfeited this argument by failing to specifically object on these grounds in the trial court. (*People v. Scott* (1994)

11

9 Cal.4th 331, 353 [forfeiture doctrine applies "to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices"].)

Defendant asks us to find in the alternative that his trial counsel was ineffective in failing to specifically object to the court's sentencing choices. The contention is without merit as defendant cannot demonstrate either element of an ineffective assistance claim.

At the sentencing hearing, the court heard lengthy victim statements from Mr. Thomas's widow, his two minor children, his parents and his twin sister. The court also allowed defendant to make a statement in which among other things, he apologized to the victim's family. The court said it had read both parties' sentencing memoranda and the probation report. Before entertaining argument, the court told counsel it was inclined to find that either a midterm or high term was warranted given the evidence at trial. The court also asked counsel to specifically address the sanity phase evidence and the weight any mental health factors should be given.

After allowing lengthy argument from counsel, the court imposed the upper term of 10 years. The court acknowledged that defendant had no prior criminal record but said that the seriousness of the facts as reflected in the trial evidence far "outweigh[ed] the fact that the defendant had no record. It involved such great violence, great bodily harm. I do believe there is an element of callousness based on the defendant's prior knowledge of what marijuana use could do to him, where he could hardly walk across the street, and that was shown in the texts that we had in evidence at this trial. And the fact that he was driving previously under the influence of marijuana . . . . He just

cared about himself.  And that all indicates a very grave danger to the safety of the community."  A single factor in aggravation is sufficient to support the trial court's exercise of discretion in imposing an upper term sentence.  (See, e.g., *People v. Osband* (1996) 13 Cal.4th 622, 728; *People v. Quintanilla* (2009) 170 Cal.App.4th 406, 413.)

Moreover, contrary to defendant's assertion the mental health evidence was disregarded, the court, at several different points during the hearing, asked questions of counsel and specifically identified the mental health testimony it found relevant.  For instance, the court said, "[O]ne of the things that stands out in the testimony of Dr. Leifer was that he, in his opinion, found it hard to believe that [defendant] would have such a detailed recollection of the events and circumstances on the day of the crime, just before the crime, just after the crime, if it was, in truth, a true psychotic break."

The court provided a thorough and reasonable explanation for its sentencing choices in accordance with the statutory requirements.  (Pen. Code, § 1170, subd. (b) ["In determining the appropriate term, the court may consider the record in the case, the probation officer's report, other reports, . . . and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing.  The court shall select the term which, in the court's discretion, best serves the interests of justice.  The court shall set forth on the record the reasons for imposing the term selected."].)

No abuse of discretion has been shown and defendant cannot demonstrate that defense counsel was ineffective for

13

failing to object to the upper term sentence or make a frivolous objection that the court disregarded certain evidence. Nor can defendant show he would have obtained a more favorable outcome had such an objection been made. (See, e.g., *People v. Cudjo* (1993) 6 Cal.4th 585, 623 [a defendant "must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings"].)

## DISPOSITION

The judgment of conviction is affirmed.


GRIMES, J.

WE CONCUR:


BIGELOW, P. J.


WILEY, J.