[No. B218891. Second Dist., Div. Two. Nov. 8, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
STEPHANIE NORDBERG, Defendant and Appellant.

### COUNSEL

Marks & Brooklier and Anthony P. Brooklier for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lance E. Winters and Robert S. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BOREN, P. J.**—Appellant Stephanie Nordberg was driving while intoxicated when her car struck and killed a motorcyclist on the freeway. A jury convicted her of gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)), and found true the special enhancement allegation that she fled the scene of the crime after the vehicular manslaughter (Veh. Code, § 20001, subd. (c)).[1] She was sentenced to a prison term of nine years, consisting of the low term of four years for the offense, plus five years for the enhancement.

Appellant contends that the true finding of the enhancement allegation for leaving the scene of the crime should be reversed because the jury was not instructed that she had to have knowledge that the accident resulted in injury to someone, or had to know that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to another person. We find that although the jury was not instructed on the knowledge requirement, as it should have been, the error was harmless beyond a reasonable doubt. Because both the prosecution's evidence and appellant's own testimony unequivocally established that appellant knew the accident was of such a nature that it was probable another person had been injured, there is no rational basis on which the instructional error could have affected the jury's verdict.

## FACTS

In July of 2007, appellant, a 21-year-old employee at a North Hollywood audio equipment company, met two of her colleagues after work for some drinks at a nearby bar. One of appellant's companions, Stephen Eagle, ordered margaritas with a single shot for himself and for appellant. He then ordered some snacks and a second round of margaritas for himself and for appellant. Approximately an hour later, they left the bar and went to a grocery store to buy some vodka and food for dinner. Appellant drove her car (a Chevrolet Monte Carlo) to the grocery store and then to Eagle's apartment, arriving at approximately 8:45 p.m.

Once at the apartment, Eagle prepared some food and poured "the first shot of vodka." He had approximately four or five shots of vodka, and appellant ate sausages and salad and had three or four shots of vodka. They did not mix the drinks with any water or juice. After dinner they kissed once, which created some awkwardness because appellant had a boyfriend. While Eagle

---

[1] Unless otherwise indicated, all further statutory references are to the Vehicle Code.

cleaned up the dishes inside, appellant went to the patio, made a phone call on her cell phone, and then indicated she wanted to leave. It was then approximately 10:00 p.m.

Because Eagle "was feeling tipsy at the time," he told appellant that he "didn't think that she should leave due to the alcohol we had consumed." Appellant replied that she "was okay to drive." Due to the awkwardness after their kiss, he did not want to detain her in his apartment any longer because she wanted to leave. Eagle then escorted appellant to her car. When appellant entered her car, he asked her again if she was "okay to drive and she assured [him] that she was." The two of them had consumed about half the bottle of vodka.

Appellant drove off and then entered the southbound Hollywood Freeway. Meanwhile, Frank Arana was riding a motorcycle on the freeway. On the back of the motorcycle were two distinct lights, a brake or taillight, and a license plate light. While Arana was riding the motorcycle, his brother (Richard Arana) and a friend (Kelly Graval), who owned the motorcycle, followed immediately behind in a white Ford F-250 truck. As their truck passed Universal Studios, a car came on the freeway, moved erratically, and "cut across many lanes." Traffic was flowing steadily, but then Graval saw that the same "vehicle came from my left side, cut in front of us rather rapidly, sped up to approach [Arana], looked like it slowed down to travel with the speed of the freeway, steadily, and then accelerated and hit [Arana from behind]."

Graval saw the car in front of him speed up to "at least" approximately 70 miles per hour and then heard the sound of the car's impact with the motorcycle, even though the windows of the truck were rolled up. Upon impact, as described by Graval, Arana "went like this [indicting] and then up, almost like he was on a motorcross jump, and came down. I was behind him, so I couldn't tell you what happened in front to the car, but I did see [Arana] go up in the air, come down, and I did see [Arana] come, you know, out from under the car and roll in front of me—in front of us." Arana ultimately landed on the ground in front of appellant's car after it hit him. The car thus struck Arana from behind and then ran over him, inflicting fatal injuries.

Appellant's car had made no prior attempt to get into the lane in which the truck and motorcycle were travelling. The lane change by her car was so abrupt the truck had to brake. After hitting Arana on the motorcycle, appellant's car went to the left and struck the center divider. Graval and Arana's brother stopped their truck and ran toward Arana. Appellant's car

then "was struggling to leave the scene." The front tires spun, and the back right tire seemed locked and dragged before it unlocked. Graval ran toward the car to try to get a license plate number and screamed, "Stop, stop, stop." The car, however, drove away and exited the off-ramp at Highland Avenue.

Several other drivers on the freeway also witnessed the erratic driving and the fatal accident. The driver in one of the nearby cars immediately called 911 on her cell phone. Another car was hit by the same car that hit the motorcycle, causing that driver's airbag to deploy.

Another driver, Joseph Garcia, saw a cloud of smoke or dust on the freeway, slowed down to approximately 10 miles per hour, and then saw a motorcycle and a person lying on the ground. On his left side, he saw a car with some minor damage that had stopped. Garcia "heard kind of like a loud rev of an engine," and then saw the damaged car speed off. The car was "peeling out, there was smoke, and at that point I decided to chase the car." He saw the car exit the freeway at Highland Avenue, hit a concrete barrier, and then veer to the right and hit a light pole.

Another driver, Dennis Nusbaum, also noticed that the freeway traffic had slowed down dramatically, and then saw a truck, a motorcycle, and a body on the ground. Nusbaum exited the freeway and saw that a car had crashed on the shoulder near the exit. The car was smoking and appellant was on the side of the road talking to two men who had parked a yellow Hummer nearby. Nusbaum got out of his vehicle and called 911 to report that he had seen a motorcycle accident and then "another car accident." Nusbaum and the two other men asked appellant if she was alright.

At some point the 911 operator asked to speak with "the young lady," and Nusbaum handed appellant his flip cell phone. Appellant, however, "closes it on the 911 operator, and she hands it back to [Nusbaum] and she pretty much says, 'Hey, look,' you know, 'I've been drinking.' " The 911 operator then called back as roadside assistance trucks arrived. Appellant complained of blurry vision. The two men from the Hummer offered to take appellant away, although the 911 operator insisted that she stay and wait for medical assistance. Appellant, who appeared to Nusbaum to be intoxicated and had an odor of "bad alcohol" about her, then departed with the two men in the Hummer. The 911 operator asked for the license number of the Hummer, but it had a dealer plate with no number.

Soon thereafter, a California Highway Patrol (CHP) officer arrived at the scene of the motorcyclist's fatal accident. Near the center divider of the freeway he found a license plate. The officer then went to the off-ramp where

appellant left her vehicle; its rear license plate matched the one he found on the freeway and from which he determined ownership of the vehicle.

Several CHP officers then went to appellant's residence in Sherman Oaks. Appellant had arrived home after the men in the Hummer who gave her a ride also assisted her in getting a taxi. When the CHP officers arrived at the residence, appellant's father answered the door. He spoke with the officers, who explained to him that appellant had been involved in a car crash, and he then attempted several times to awaken appellant.

When appellant came out of the bedroom and approached the CHP officers, her gait was unsteady, her eyes were red and watery, the odor of alcohol was apparent, and she had abrasions on her forehead and face. One of the officers tested her eye movement, detected a strong odor of alcohol on her breath, and opined that she was physically impaired by alcohol. At approximately 1:30 a.m. the officer gave appellant three breath analyzer tests, each of which returned readings of 0.18 percent blood-alcohol content. A criminalist for the Los Angeles Police Department subsequently determined, based on the timing and amount of alcohol and food appellant had consumed and her physical stature, that at the time of the fatal accident appellant's blood-alcohol content could have been as high as 0.27 percent.

The CHP officer concluded that appellant had caused the collision with the motorcycle by driving her car while under the influence of alcohol and in a manner that was extremely hazardous to other vehicles. Appellant's hazardous driving violated several Vehicle Code sections and began when she merged onto the freeway and unsafely crossed two or more lanes causing other vehicles to brake, then accelerated to an unsafe speed over the speed limit, and then followed too closely as she wedged herself between the motorcycle and the truck and unreasonably accelerated into the motorcycle. The CHP officer further opined that based on the damage to the windshield on appellant's car, Arana was "launched off his motorcycle, onto the hood and into the windshield of [appellant's] car, and then from there thrown to the roadway."

Appellant testified at trial and described her driving behavior. After she entered the freeway, she was "switching lanes" and "saw that the lane was clear and I went into it." However, "The next thing I know, I'm getting in—I got—I'm getting into, like, oh—I get into an accident, and I'm kind of losing control of my wheel a little bit and [the] car is just steering—I can't control my car right. The next thing I know, I'm getting into more accidents."

Appellant did not know what to do but "knew that I needed to get off the freeway just because I didn't want to get into any more collisions with anybody else. [¶] Umm, I—after that, I just remember just—everything just blacked out on me." The next thing she knew was that "I wake up and my car is in a slant." Appellant got out of the car and "I hear a man screaming at me." She was still trying to find out why "is my car—why is this pole down? Why is my car on the side?" Appellant was "just freaking out. I was scared. I was shaking. I had never been in a huge accident in my life before and I didn't know what to do."

Appellant recalled, "I remember just waking up confused . . . ." However, she did not fall asleep and was not tired. Her head hurt, and she had a bump and scratches on her head. Appellant's first awareness after the accident was of "a man screaming at me," but she was most concerned at the time about why her car was at an angle. She had "no clue" that she had hit a motorcycle or the center divider. When she got out of her car, the man who was screaming at her "just kept hassling me. He just—he was just scaring me a little bit. He was making me more panicky than I was feeling. I felt like I needed to step away from the situation, from him." Then, the men from the Hummer approached, offered to assist her, drove her away, and ultimately assisted her in getting her a taxi.

Appellant asserted that she did not know that she hit a motorcycle. She explained, "I didn't see it," and that she "wouldn't have switched lanes if the motorcycle was there. I wouldn't have never done that. That would not be me." Appellant also did not recall hitting the median embankment.

She further explained that she did not "know how to keep control on what was going on with—with my vehicle as I'm hitting things. I was trying to avoid hitting anything else as I was driving, but I—I couldn't—I had—not full-on control with my vehicle." When she was questioned by her father, she only told him that she hit a pole, not a motorcycle, the center divider, or another car.

Appellant also did not recall going around the side of and then in front of the white truck on the freeway. In fact, appellant thought that she was travelling in the proper direction on the freeway, although she was going southbound on the 101 freeway, towards Hollywood, to go to Sherman Oaks, when she should have been travelling northbound from North Hollywood to get home.

At the time of the collision, she heard impact noise. As to whether appellant saw any vehicles in front of her, however, she explained: "Honestly, a lot of it is—in my head, it—it's not—I don't—because I hear people saying

things throughout [the trial] when I've been sitting here, and a lot of it, I don't remember it, and a lot of it, I—I'm seeing if I could remember it, but all I know at the time is I had no idea."

## DISCUSSION

I. *The trial court erred in failing to instruct the jury on the knowledge requirement for the sentencing enhancement for leaving the scene of the vehicular manslaughter.*

Appellant contends that the trial court erred in failing to instruct the jury that to find true the enhancement allegation under section 20001, it had to find that appellant had knowledge that she had been in an accident that had resulted in injury to someone, or that she had to know the accident was of such a nature that it was reasonably likely to result in injury to another person.[2] Indeed, section 20001 has a knowledge requirement that is an essential element of the five-year sentence enhancement and the instruction given on the enhancement, as previously noted, did not specifically mention the knowledge requirement.

■ Section 20001 addresses two types of penalties for leaving the scene of a vehicular accident; one is a substantive offense and the other is an enhancement for vehicular manslaughter. Subdivisions (a) and (b) of section 20001 proscribe a substantive offense often referred to as felony hit and run.

---

[2] The trial court tailored a generic CALJIC instruction on enhancements, CALJIC No. 17.24.1, to the charged enhancement (§ 20001, subd. (c)), and instructed the jury as follows: "It is further alleged that at the time of the commission of the crime charged in Count One, and to the lesser crime Vehicular Manslaughter With Gross Negligence Not Under The Influence, a violation of Penal Code section 192(c)(1), that the defendant fled the scene of the crime, in violation of Vehicle Code section 20001(c). [¶] In order to find that the defendant fled the scene of the crime, you must find the following to have been proven beyond a reasonable doubt: [¶] 1. The defendant was involved in an accident resulting in injury or death; [¶] 2. The defendant failed to give her name, current residence address, registration number of the vehicle she was driving to the person struck, and the defendant failed to give the same information to any traffic or police officer at the scene of the accident; [¶] 3. The defendant failed to render to any person injured in the accident reasonable assistance, including transporting, or making arrangements for transporting any injured person to a physician, or hospital if it was apparent that treatment was necessary; and [¶] 4. In the event of death of any person resulting from the accident, if there be no traffic or police officer at the scene of the accident to whom to give the information as noted in element number 2 above, the defendant shall, without delay, report the accident to the nearest office of the Department of the California Highway Patrol or office of a duly authorized police authority and submit with the report the information as noted in element number 2 above. [¶] If you find defendant guilty of the crime charged in Count One, or to the lesser crime thereto, you must determine whether or not the truth of this allegation has been proved. [¶] The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true. [¶] Include a special finding on that question, using a form that will be supplied to you."

The driver of a vehicle involved in an accident resulting in injury or death to another person "shall immediately stop the vehicle at the scene of the accident" and shall fulfill certain specified duties pertaining to identification, reporting, and rendering aid. (§ 20001, subd. (a).) The failure to do so constitutes a crime, with the sentencing options dependent upon the extent of the injury inflicted during the accident. (§ 20001, subd. (b)(1) & (2).)[3] Appellant was *not* charged with that substantive offense.

Appellant was charged, however, with a conceptually related sentence enhancement allegation specified in another subdivision of section 20001. Subdivision (c) of section 20001 permits the charging and then the mandatory imposition, if found true, of a five-year sentence enhancement for anyone "who flees the scene of the crime after committing" a vehicular manslaughter in violation of either Penal Code section 191.5 or section 192, subdivision (c)(1). Appellant was charged with and convicted of vehicular manslaughter under the former provision, thus establishing the predicate for the sentence enhancement.

■ Although a knowledge requirement is not specifically mentioned in *any* of the subdivisions of section 20001, well-settled case law has established that "knowledge of injury is an essential element of the crime proscribed by [section 20001]." (*People v. Holford* (1965) 63 Cal.2d 74, 79 [45 Cal.Rptr. 167, 403 P.2d 423].) The Supreme Court in *Holford* explained: "Usually, however, such knowledge must be derived from the surrounding facts and circumstances of the accident. [Citation.] Yet the driver who leaves the scene of the accident seldom possesses actual knowledge of injury; by leaving the scene he forecloses any opportunity to acquire such actual knowledge. Hence a requirement of actual knowledge would realistically render the statute useless. We therefore believe that criminal liability attaches to a driver who knowingly leaves the scene of an accident if he actually knew of the injury or if he knew that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person." (*Id.* at p. 80; see also *People v. Harbert* (2009) 170 Cal.App.4th 42, 53 [87 Cal.Rptr.3d 751].)

---

[3] CALJIC No. 12.70, the felony hit-and-run instruction applicable to violations of section 20001, subdivisions (a) and (b), provides as follows at the outset: "Every person who as the driver of any vehicle is *knowingly* involved in an accident resulting in [the death of] [or] [injury to] any person . . . ." (Italics added.) CALJIC No. 12.70 further explains: "The word 'knowingly' means that the driver of the vehicle involved knew that an accident had occurred, knew that [he] [she] was involved in the accident and either knew that the accident resulted in [injury to] [or] [death of] a person or knew that it was of such a nature that it was probable that it resulted in [injury] [or] [death]."

The jury instructions that address the knowledge requirement of section 20001, subdivisions (a) and (b), are also contained in CALCRIM Nos. 2140 and 2141.

Thus, for the purposes of the substantive offense of failing to stop at the scene of an automobile accident, actual knowledge is not required. A defendant's knowledge of having been in an accident involving an injured person may be established by circumstantial evidence, and a defendant's simple denial of the requisite knowledge is not determinative. (*People v. Harbert, supra*, 170 Cal.App.4th at pp. 53–55.) By parity of reasoning, we find that the same knowledge requirement and the same analysis that are applicable to the substantive offense defined in section 20001, subdivisions (a) and (b), are also applicable to the five-year enhancement defined in section 20001, subdivision (c), which is the provision at issue here.

We note that the trial court modified a miscellaneous, generic enhancement-allegation instruction (CALJIC No. 17.24.1), apparently because it did not have the benefit of any specifically focused CALJIC instruction to assist it in advising the jury as to the section 20001, subdivision (c), enhancement allegation. CALCRIM No. 2160 (new Jan. 2006), however, provided thorough and appropriate guidance and, in pertinent part, states as follows: "To prove this allegation, the People must prove that . . . [t]he defendant knew that (he/she) had been involved in an accident that injured another person [or knew from the nature of the accident that it was probable that another person had been injured]."

Accordingly, the trial court erred in failing to instruct on the knowledge requirement for the sentence enhancement allegation. Moreover, the failure to instruct the jury on an element of a sentencing enhancement allegation violates federal constitutional rights to due process and a jury trial. (*People v. Black* (2007) 41 Cal.4th 799, 811 [62 Cal.Rptr.3d 569, 161 P.3d 1130]; *People v. Sengpadychith* (2001) 26 Cal.4th 316, 326 [109 Cal.Rptr.2d 851, 27 P.3d 739].)

II. *The failure to properly instruct the jury was harmless error.*

The instructional error in failing to advise the jury on the knowledge element of the sentence enhancement was harmless beyond a reasonable doubt. Generally, an instructional error that removes an element of an offense from a jury's consideration is not deemed a structural defect in the trial mechanism and is not automatically reversible. (*People v. Flood* (1998) 18 Cal.4th 470, 497, 502–503 [76 Cal.Rptr.2d 180, 957 P.2d 869].) So, too, here, the instructional error in omitting to address the knowledge requirement in the enhancement allegation is not automatically reversible. Rather, the error is subject to a harmless error analysis and would be reversible "unless it can be shown 'beyond a reasonable doubt' that the error did not contribute to the

jury's verdict." (*People v. Sengpadychith, supra,* at p. 326, quoting *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

One situation in which an instructional error in omitting an element of an enhancement allegation from jury consideration may be found harmless is when "the defendant concedes or admits that element." (*People v. Flood, supra,* 18 Cal.4th at pp. 504, 505.) Another situation warranting a harmless error conclusion is where "*all* of the evidence at trial relevant to the issue in question [is such that] there is no rational basis upon which the instructional error could have affected the jury's verdict." (*Id.* at p. 505.) Yet another approach is to assess whether the jury instructions viewed as a whole correctly state the law, with the result that there is no instructional error because the omission complained of is fully addressed by other properly given instructions.[4] (*People v. Holt* (1997) 15 Cal.4th 619, 677 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Wilson* (1992) 3 Cal.4th 926, 943 [13 Cal.Rptr.2d 259, 838 P.2d 1212].)

In the present case, we deal with the omitted element of knowledge and whether appellant "actually knew of the injury or if [she] knew that *the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person.*" (*People v. Holford, supra,* 63 Cal.2d at p. 80, italics added; see also *People v. Harbert, supra,* 170 Cal.App.4th at p. 53.) The requisite knowledge may be imputed to the driver of a vehicle not only where the fact of personal injury is visible and obvious, but also "where the seriousness of the collision would lead a reasonable person to assume there must have been resulting injuries." (*People v. Carter* (1966) 243 Cal.App.2d 239, 241 [52 Cal.Rptr. 207].) Even if appellant did not specifically know that injury to another person had resulted from the accident, she must have known from the nature of the accident that it was probable that another person had been injured.

In the midst of flowing freeway traffic, appellant sped up to at least 70 miles per hour before striking the rear of Arana's motorcycle and then crashing into the center divider. It was undisputed that her windshield was damaged, and that the damage was likely caused as Arana's body was flung against it. Also, a loud sound accompanied the contact with the motorcycle and/or Arana's body before appellant's car crashed into the center divider.

---

[4] Respondent focuses on this latter approach. Respondent argues principally that appellant's defense of unconsciousness was meant to apply to the timeframe when she collided with motorcycle, and that the jury instructions on unconsciousness (CALJIC Nos. 4.30 & 4.31) compensated for the failure of the court to include a knowledge requirement in the elements of the enhancement allegation. However, we eschew such an approach because consciousness is not synonymous with knowledge, and, in any event, any unconsciousness occurred after the collision with the motorcycle.

Additionally, several other drivers on the freeway at the time of the accident either saw the accident itself or saw a body lying on the freeway. The totality of the circumstances renders it inconceivable that appellant, who at the time was conscious, would not reasonably have known from the nature of the accident that it was probable another person had been injured. Thus, all of the evidence at trial relevant to the issue of appellant's imputed knowledge of an injury to another person leads to the ineluctable conclusion that "there is no rational basis upon which the instructional error could have affected the jury's verdict." (*People v. Flood, supra*, 18 Cal.4th at pp. 504, 505.)

Moreover, appellant's own testimony revealed that she knew she had been in a collision and consciously decided to leave the scene and exit the freeway. She realized that after she changed lanes, she got into an accident, lost control of the steering wheel, could not properly control her car, and "The next thing I know, I'm getting into more accidents." According to appellant, she "knew that I needed to get off the freeway just because I didn't want to get into any more collisions with anybody else. [¶] Umm, *I—after that*, I just remember *just—everything just blacked out on me.*" (Italics added.) She then woke up and found her car at a slant near an off-ramp with someone screaming at her.

It is apparent from appellant's own testimony that even assuming she at some point blacked out or was unconscious, it occurred *after* she left the scene of the accident with the motorcycle and *after* she drove her car away from the center divider into which it had crashed. Thus, when appellant initially left the scene of the fatal accident, she was conscious and intentionally drove off. Even if appellant did not specifically realize she had rear-ended a motorcycle and that the motorcyclist had been flung against her front windshield, she knew she had been in a collision on the freeway that involved others and had to know from the general nature of the accident and damage to her car that it was probable that someone had been injured.

██ Accordingly, because both "overwhelming, undisputed evidence" (*People v. Flood, supra*, 18 Cal.4th at p. 507) and appellant's own testimony unequivocally established that the accident was of such a nature that it was reasonably probable a person had been injured, there is no rational basis on which the instructional error concerning the element of knowledge could have affected the jury's verdict. (*Id.* at pp. 504, 505.) The failure to instruct the jury that appellant either had to know she had been involved in an accident that injured another person, or had to know from the nature of the accident that it was probable another person had been injured, was harmless beyond a reasonable doubt. A reversal and retrial of the enhancement allegation is not warranted.

## DISPOSITION

The judgment is affirmed.

Ashmann-Gerst, J., and Chavez, J., concurred.

A petition for a rehearing was denied November 23, 2010, and appellant's petition for review by the Supreme Court was denied February 16, 2011, S189007.