Filed 4/24/23 P. v. Oliva CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HUGO REYES OLIVA,<br><br>    Defendant and Appellant. | H050144<br>(Monterey County<br>Super. Ct. No. 22CR001281) |

Defendant Hugo Reyes Oliva drank beer, drove an SUV, hit a man, crashed, and fled, leaving behind the injured man and a passenger trapped in the SUV. A jury convicted Oliva of two counts of driving under the influence of alcohol (DUI) causing injury and one count of hit-and-run driving resulting in injury. The trial court sentenced Oliva to five years and eight months in prison.

On appeal, Oliva contends that there is insufficient evidence to support his hit-and-run driving conviction under Vehicle Code section 20001, subdivision (a).[1]

For the reasons explained below, we affirm the judgment.

---

[1] Unspecified statutory references are to the Vehicle Code.

# I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In February 2022, the Monterey County District Attorney filed an information charging Oliva with felony driving under the influence of alcohol causing injury (§ 23153, subd. (a); count 1), felony driving with a blood-alcohol content (BAC) of 0.08 percent or more causing injury (§ 23153, subd. (b); count 2), hit-and-run driving resulting in injury to Stephen H.[2] (§ 20001, subd. (a); count 3), and driving without evidence of financial responsibility (§ 16028, subd. (a); count 4 [an infraction]).  For counts 1 and 2, the information included enhancements alleging that Oliva had suffered a prior DUI conviction (§§ 23540, 23560), had a BAC of 0.15 percent or more (§ 23578), and had personally inflicted great bodily injury (GBI enhancement) (Pen. Code, § 12022.7, subd. (a)).

On May 5, 2022,[3] during Oliva's jury trial, the trial court dismissed count 4 pursuant to Penal Code section 1118.1.

On May 6, the jury found Oliva guilty on counts 1, 2, and 3 as charged and found true the enhancement allegations regarding Oliva's BAC and the infliction of great bodily injury.  Thereafter, Oliva admitted in court the allegation regarding his prior DUI conviction.

On June 9, the trial court sentenced Oliva to prison for a total of five years and eight months, comprising the middle term of two years for count 1, consecutive to a three-year term for the attached GBI enhancement and eight months for count 3.  The court also imposed and stayed, pursuant to Penal Code section 654, a sentence for count 2

---

[2] We refer to the victim by his first name and last initial to protect his privacy interests.  (Cal. Rules of Court, rule 8.90(b)(4).)  In addition, we refer to a witness in similar fashion to protect his privacy interests.  (See *id.*, rule 8.90(b)(10).)

[3] Unless otherwise indicated, all dates were in 2022.

that is the same as that for count 1. The court awarded custody credits and imposed various fines, fees, and assessments.

Oliva timely appealed.

B. *Evidence Presented at Trial*

1. <u>Prosecution Evidence</u>

On February 5, about 5:00 p.m., Oliva left home in a Ford SUV owned by his long-term partner.

About 12:20 a.m. the next day, Oliva and his passenger, Kaden C., drove from an area near the train tracks in Salinas's Chinatown to get some cigarettes. A few minutes after they obtained the cigarettes, while Oliva was driving them back to Chinatown, they crashed, ending up in an Amtrak parking lot. The crash caused Kaden C.'s foot to get stuck and he was unable to exit the SUV. Kaden C. called out to Oliva for help, but Oliva had already exited the vehicle. Kaden C. testified that he might have lost consciousness for a time and was not sure how long Oliva had been gone when he (Kaden C.) called out for help. A couple of minutes later, Kaden C. freed himself and saw first responders attending to a man on the sidewalk. Police detained Kaden C., and first responders treated him at the scene.

Stephen H. was riding his bicycle in Salinas. He stopped on the sidewalk at an intersection (about five feet from the street) to change the music on his phone. While standing and straddling his bicycle, Stephen H. heard "two chirps of a tire." He looked up and saw "black" as a vehicle smashed into him and his bicycle. "[T]he next thing [he] knew], [he] was laying on the ground." He felt "like [he] was hit by a truck." He had a sharp pain in his leg and his head was throbbing. The front of his bicycle was "smashed up," and his bicycle ended up "under the front of the truck [that was] on its roof in the parking lot."

Stephen H. suffered a fractured femur, a hip fracture, and a laceration on his head, among other injuries. A doctor repaired Stephen H.'s femur with a rod. The doctor

testified that Stephen H.'s orthopedic injuries carried a risk of continued pain, further surgery, and stiffness. He stated Stephen H.'s recovery to a "preinjury level" could take one to two years. At the time of Oliva's trial (three months after the crash), Stephen H. was experiencing "[c]ontinual pain" in his leg, had a limp, and needed a cane to walk.

A witness who was stopped at the intersection when the crash happened testified that he saw Oliva's SUV "hit some gentleman on a bicycle." The witness "heard a tire squealing" before the impact, "like the car lost control." The SUV rolled over a couple times and two people crawled out. "One ran away, and one was kind of trapped in there until he ran away." The driver of the SUV (whom the witness identified in court as Oliva) exited first, wearing black clothes. Oliva then put on a black hoodie and ran, limping, toward the train tracks.

Another witness who was near the scene that night testified that he heard a loud crash and upon looking in the direction of the crash, saw a big cloud of dust. As the witness walked up to the crash scene, he saw the SUV upside down and with a bicycle next to it. He also saw his friend (Stephen H.) on the ground nearby. The witness observed two people walking away from the crash. He "tried to catch up with" the person whom he thought was the driver. That person "was the first one out, and he was limping and looked like he was evading the scene." The witness lost contact with the person along the train tracks after four or five minutes. The person was a medium-built Hispanic male with short hair wearing a "dark shirt or jacket, dark pants, [and] dark shirt."

Salinas Police Department Sergeant John McNeil responded to a radio call about "a vehicle collision rollover with the occupants of that vehicle fleeing the scene." Sergeant McNeil searched along the railroad tracks and contacted Oliva approximately one-third of a mile away from the crash scene. Oliva was lying down, wearing dark clothing, and had a "fresh" laceration on the top of his scalp.

4

Salinas Police Officer Gabriel Garcia investigated the crash. Officer Garcia observed skid marks beginning in the roadway and leading to the overturned SUV beside a bicycle and broken glass in a "well-lit" parking lot. Garcia opined that the skid marks indicated Oliva had made "an unsafe turn movement" and explained that "the skid marks go directly from the edge of the number two [(center)] lane through the right turn pocket and into the sidewalk and eventually end up in the middle of the parking lot." The SUV traveled about 100 to 110 feet beyond the estimated point of impact. Garcia further opined that speeding was a factor in the crash.

Salinas Police Officer Austin Scaggs observed Oliva's field sobriety testing. Based on Oliva's appearance, performance on the field sobriety tests, and admission that he had consumed approximately seven beers (and had used methamphetamine), Officer Scaggs believed that Oliva was under the influence of alcohol. Scaggs administered a breath test to Oliva, which yielded BAC results of 0.18 percent and 0.16 percent.

California Department of Justice criminalist Denise Cornejo testified about the effects of alcohol on the human body and a person's ability to drive.

### 2. Defense Evidence

Oliva testified as the only defense witness. Oliva stated that late on February 5, he was in Salinas's Chinatown. There, two Hispanic men confronted him. After the men asked Oliva several gang-related questions, one of them struck Oliva several times. Oliva fell to the ground with one of the assailants, hitting his head on the pavement. He also was kicked several times, sustaining injuries to his ribs and face. Oliva lost his keys, debit card, driver's license, and benefits card.

The attack took place near a tent, and a person who was inside the tent came out and started yelling. Oliva got up and tried to walk away. He tripped over a sidewalk, injuring his ankle and lacerating his head. Oliva headed toward the train tracks until he could not walk any more, at which point he sat down. He remained there until the police approached him approximately 25 minutes later.

5

On cross-examination, Oliva stated that he was in Chinatown that night looking for a friend (whom he refused to name in court), and the attack occurred approximately 200 feet from his SUV about three hours after he arrived in Chinatown. Oliva acknowledged that when the police contacted him after the attack, he had cash and credit cards in his jacket. Oliva also acknowledged that he told the officers that he had consumed seven beers that night, stopped drinking at 9:00 p.m., used methamphetamine, and surmised that his BAC was about 0.15 percent.

## II. DISCUSSION

Oliva contends that his conviction on count 3 for hit-and-run driving resulting in injury must be reversed for insufficient evidence because "there is no evidence in the record that establishes beyond a reasonable doubt that [he] knew he had injured Stephen [H.]."

The Attorney General counters that, under relevant law, Oliva "need not have known who, specifically, he injured. The evidence at trial established that [Oliva] had the requisite knowledge of injury to another person, and his claim should therefore be rejected." Nevertheless, the Attorney General focuses on Oliva's collision with Stephen H. and his injury (rather than any injury that Oliva caused to Kaden C.) when arguing that the evidence was sufficient to prove the knowledge requirement under section 20001.

Oliva replies that his due process rights would be violated if his conviction were allowed "based upon injury to [Kaden C.] when [Oliva] was on notice only of the need to defend against injury to [Stephen H.]." Oliva further asserts that his "conviction may only be upheld if there was substantial evidence that [he] knew he had injured [Stephen H.]" and "that evidence is lacking."

A. *Background*

In count 3, the information accused Oliva of violating section 20001, subdivision (a) (hereafter section 20001(a)), when he "did unlawfully, and knowingly, being a driver of a vehicle involved in an accident resulting in injury to a person other than himself[],

6

Stephen [H.], did fail, refuse, and neglect to give to the injured person and to a traffic and police officer at the scene of the accident his[] name and address, the registration number of his/her vehicle, and the name of the owner of said vehicle; to exhibit his[] operator's license; to render reasonable assistance to the injured person; and perform the duties specified in Vehicle Code [s]ections 20003 and 20004."

The trial court instructed the jury on count 3 using CALCRIM No. 2140. The jury instruction did not mention Stephen H. specifically and stated, in part: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. While driving, the defendant was involved in a vehicle accident; [¶] 2. The accident caused injury to someone else; [¶] 3. The defendant knew that he had been involved in an accident that injured another person or knew from the nature of the accident that it was probable that another person had been injured; [¶] [AND] [¶] 4. The defendant willfully failed to perform one or more of the following duties: [¶] . . . [¶] (b) To provide reasonable assistance to any person injured in the accident." (CALCRIM No. 2140.)

The jury instruction further explained: "To provide reasonable assistance means the driver must determine what assistance, if any, the injured person needs and make a reasonable effort to see that such assistance is provided, either by the driver or someone else. . . . [¶] The driver of a vehicle must perform the duties listed regardless of who was injured and regardless of how or why the accident happened. . . . [¶] You may not find the defendant guilty unless all of you agree that the People have proved that the defendant failed to perform at least one of the required duties. You must all agree on which duty the defendant failed to perform." (CALCRIM No. 2140.)

Oliva's defense counsel did not object to the trial court's instruction.

In closing argument, the prosecutor asserted that the second element of CALCRIM No. 2140 (regarding injury to another person) was satisfied because the "crash cause[d] injury to the victim in [this] case, Mr. Stephen [H.]." As to the third element (regarding the defendant's knowledge of injury to another person), the prosecutor argued that that

7

element was satisfied because Oliva "kn[e]w that his friend [Kaden C.] was injured because his friend called him for help. Help, help, my foot is stuck, so we know that [Oliva] kn[e]w that, but there was another victim, [Stephen H.]. [¶] And we can take from the fact that [Oliva] fled the scene and from his actions that he knew someone else was injured in the crash. That's the only reason he would have fled, and the fact that he also was under the influence, of course." The prosecutor argued further that Oliva "did not provide any assistance to [Stephen H.], and he did not provide any assistance to his passenger [Kaden C.]. So element number four has been satisfied." Oliva's defense counsel did not object to the prosecutor's argument.

Defense counsel did not specifically address count 3 in his closing argument. Rather, defense counsel urged the jury to acquit Oliva because of mistaken identity, stating: "No one disputes [Oliva] was intoxicated when he was arrested, and no one disputes that Stephen [H.] was injured. The real dispute is over who was the real driver in this case."

The jury returned a general verdict on count 3, finding Oliva "[g]uilty of the crime of Hit and Run Resulting in Injury, in violation of California Vehicle Code [section] 20001(a)."

B. *Legal Principles*

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Powell* (2018) 5 Cal.5th 921, 944; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) "In applying this test, we . . . presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) "We 'must accept logical inferences that the jury might have drawn

8

from the circumstantial evidence.' " (*Ibid*.) " 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid*.) "However, '[a] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.) Furthermore, a defendant "forfeit[s] his right to object to an alleged variance between the pleading and the proof by failing to raise the objection in the trial court." (*People v. Maury* (2003) 30 Cal.4th 342, 427.)

Section 20001(a) provides: "The driver of a vehicle involved in an accident resulting in injury to a person, other than himself or herself, or in the death of a person shall immediately stop the vehicle at the scene of the accident and shall fulfill the requirements of [s]ections 20003 and 20004." "Vehicle Code sections 20003 and 20004, in turn, require the driver to stop and provide identification and render aid to the victim, as well as to report the accident to authorities if there is no police officer present. Failure to comply with these requirements is a criminal offense." (*People v. Martinez* (2017) 2 Cal.5th 1093, 1102.)

" 'The gravamen of a section 20001 offense . . . is not the initial injury of the victim, but leaving the scene without presenting identification or rendering aid.' " (*People v. Wood* (2000) 83 Cal.App.4th 862, 866, italics omitted.) There can be only one conviction for leaving the scene of an accident even if there are multiple victims. (See *People v. Newton* (2007) 155 Cal.App.4th 1000, 1002, 1005; *People v. Calles* (2012) 209 Cal.App.4th 1200, 1217.)

Our Supreme Court has explained that section 20001 "penalizes the driver who fails to stop the vehicle which is 'involved in an accident resulting in injury'; previous

9

cases have said that knowledge of injury is an essential element of the crime proscribed by that section [citations]. Usually, however, such knowledge must be derived from the surrounding facts and circumstances of the accident. [Citation.] Yet the driver who leaves the scene of the accident seldom possesses actual knowledge of injury; by leaving the scene he forecloses any opportunity to acquire such actual knowledge. Hence a requirement of actual knowledge of injury would realistically render the statute useless. We therefore believe that criminal liability attaches to a driver who knowingly leaves the scene of an accident if he actually knew of the injury or if he knew that the accident was of such a nature that one would reasonably anticipate that it resulted in injury to a person." (*People v. Holford* (1965) 63 Cal.2d 74, 80.)

"Thus, for the purposes of the substantive offense of failing to stop at the scene of an automobile accident, actual knowledge is not required. A defendant's knowledge of having been in an accident involving an injured person may be established by circumstantial evidence, and a defendant's simple denial of the requisite knowledge is not determinative." (*People v. Nordberg* (2010) 189 Cal.App.4th 1228, 1238; see also *People v. Mace* (2011) 198 Cal.App.4th 875, 881; *People v. Harbert* (2009) 170 Cal.App.4th 42, 53–55 (*Harbert*).)

Section 20001(a) thus requires proof of four elements: (1) the defendant was involved in a vehicle accident; (2) the accident caused injury to someone else; (3) the defendant knew or should have known the accident injured another person; (4) the defendant willfully failed to perform duties required under sections 20003 and 20004. (*People v. Rocovich* (1969) 269 Cal.App.2d 489, 492–493; § 20001(a).)

C. *Analysis*

Oliva asserts that "[t]here is nothing in this record to indicate that [he] had the requisite knowledge that he had hit Stephen [H.]." Oliva further claims that it cannot "be said that the accident occurred when [he] saw that he was headed for [Stephen H.], slammed on the breaks [*sic*] to avoid him and skidded."

10

Viewing the evidence in the light most favorable to the judgment, we are not persuaded by Oliva's contentions.[4]

California courts have recognized several factors for determining whether a defendant knew or should have known the accident injured another person, including the sound of the collision (particularly a collision involving a car and a bicycle and the fall of the bicycle) (*People v. Roche* (1942) 49 Cal.App.2d 459, 462), the seriousness of the collision (*People v. Carter* (1966) 243 Cal.App.2d 239, 241), the extent of the damage to the defendant's car (*People v. Wolf* (1978) 78 Cal.App.3d 735, 738, 740), that the defendant drove off the roadway (*ibid.*), and the defendant's post-collision actions (*Harbert*, *supra*, 170 Cal.App.4th at p. 56; see *People v. Bammes* (1968) 265 Cal.App.2d 626, 634, disapproved on another ground in *Byers v. Justice Court* (1969) 71 Cal.2d 1039, 1045).

Here, substantial evidence supports Oliva's actual or constructive knowledge that the collision resulted in injury to Stephen H. This crash was considerable, involving a departure from the roadway and travel across a sidewalk into a parking lot. Further, the crash included indicia from which a juror could infer that Oliva saw Stephen H. before hitting and severely injuring him. Stephen H. testified that he heard "two chirps of a tire" before he was hit while standing over his bicycle on the sidewalk. Similarly, a witness who was stopped at the intersection heard "tire squealing" before Oliva's SUV impacted Stephen H. Additionally, Officer Garcia testified about "skid marks in the roadway" and described a photo depicting skid marks that "go all the way throughout the right turn pocket onto the sidewalk and eventually lead into the parking lot of the train station." Although Officer Garcia did not provide any opinion regarding whether the skid marks

---

[4] Because we conclude *post* that there was sufficient evidence to sustain Oliva's conviction on count 3 based solely on his actual or constructive knowledge of injury to Stephen H., we need not address Oliva's additional argument that due process protections preclude any conviction based on his knowledge of Kaden C.'s injury.

resulted from braking, these circumstances support a reasonable inference that Oliva saw Stephen H. and applied his brakes shortly before hitting him, thereby leaving skid marks in the roadway.

The evidence concerning Stephen H.'s damaged bicycle further supports that Oliva knew or should have known the crash injured another person. After impacting Stephen H. and his bicycle, Oliva's SUV caused the bicycle to travel about 100 to 110 feet into the well-lit Amtrak parking lot. The bicycle ended up beside the overturned SUV. Stephen H. could see his bicycle from where he lay, and a witness said he saw the bicycle as he approached the SUV. Their observations of the bicycle and its final position near Oliva's wrecked SUV support an inference that Oliva saw the bicycle during the crash or, at least, lying on the ground near his SUV after the crash. In turn, a juror could reasonably infer that when Oliva climbed out of his SUV, he knew or should have known that he had hit someone who had been using the damaged bicycle.

Oliva's actions after the crash also support a reasonable inference that he knew he had injured Stephen H. Oliva quickly departed the crash scene, evading the witness who pursued him, and ignoring his friend Kaden C.'s plea for help. Although Oliva's flight may have been motivated partly by his having driven under the influence, under the circumstances of this crash, a juror could reasonably consider Oliva's flight as tending to show consciousness of guilt as to his knowledge of injury to Stephen H. (See Pen. Code, § 1127c.)

On this record, we cannot say " 'it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*Zamudio*, *supra*, 43 Cal.4th at p. 357.) The evidence here sufficiently proved the challenged knowledge requirement under section 20001(a). We thus conclude that there is sufficient evidence

12

from which a reasonable juror could find beyond a reasonable doubt that Oliva violated section 20001(a).[5]

## III. DISPOSITION

The judgment is affirmed.

---

[5] In the conclusion section of his opening brief, in addition to asking that we reverse his conviction on count 3, Oliva asks us to reduce the restitution fine because "the trial court used the formula set forth in Penal Code section 1202.4, subdivision (b)(2)." He similarly asks us to reduce the court operations assessment (Pen. Code, § 1465.8, subd. (a)), the court facilities assessment (Gov. Code, § 70373, subd. (a)), and the emergency medical air transportation penalty assessment (Gov. Code, § 76000.10) imposed at his sentencing. Oliva's requests appear to be premised on an assumption that we would reverse his hit-and-run driving conviction and, in turn, order reduction of the restitution fine and assessments accordingly. Because we do not reverse the hit-and-run driving conviction and otherwise discern no reason to reduce the restitution fine and identified assessments, we reject Oliva's requests.

_____

                             Danner, J.

WE CONCUR:

_____

Bamattre-Manoukian,  Acting P.J.

_____

Wilson,  J.

**H050144**
***People v. Oliva***