Filed 5/12/23  P. v. Oliver CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B317368 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA106883) |
| v. | |
| HOWARD OLIVER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Judith Levey Meyer, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Carlos Ramirez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

Howard Oliver appeals from the judgment entered after a jury convicted him of conspiracy to cheat and defraud Medi-Cal (count 1; Pen. Code,[1] § 182, subd. (a)(4)), Medi-Cal fraud (count 2; § 14107, subd. (b)(4)); grand theft (count 3; § 487, subd. (a)), false and fraudulent claims (count 4; § 549), insurance fraud (count 6; § 550, subd. (b)(3)), and four counts of tax evasion for 2012 through 2015 (counts 7 through 10; Rev. & Tax Code, § 19706). As to counts 1 through 4 and 6, the jury found true several enhancements based upon the loss of property in excess of various monetary amounts. (§§ 186.11, subd. (a)(2) & (3), 12022.6, subd. (a)(1)–(3).) Oliver was sentenced to an aggregate sentence of seven years eight months in prison, and ordered to pay over $2.85 million in restitution.

On appeal, Oliver claims the trial court erred when it declined to grant a mistrial after a prosecution witness commented on his guilt, and further erred when it refused to allow the defense to probe that same witness's bias and motive. We reject those contentions. However, Oliver is entitled to the benefit of recently enacted sentencing legislation broadening a trial court's authority to stay certain sentences. We therefore remand for further sentencing proceedings.

---

[1] All further undesignated statutory references are to the Penal Code.

## BACKGROUND[2]

### A. The prosecution's case

#### 1. *West Coast Counseling Center*

In 1997, Oliver hired accountant Lou Cannon to assist with taxes and bookkeeping for his business, Central Desert Industrial Medical Group (Central Desert), an Apple Valley medical clinic which provided medical care to injured workers. Cannon eventually learned that Oliver was also the director of lucrative alcohol and drug counseling centers, and became interested in operating one. Oliver counseled her on starting a facility, providing her information and documentation to submit with the relevant applications, and loaned her funds to start the facility.

In 2008, Cannon opened West Coast Counseling Center (West Coast) in Long Beach, designating herself as the executive director and Oliver the medical director. Oliver provided his medical license and advised Cannon as to which office to rent, informing her an examination room was not necessary. Oliver signed the medical director's job description, including his responsibility to make and approve treatment plans, and also signed West Coast's business license. The first person Cannon hired was Leroy Love—a referral from Oliver who acted as

---

[2]    At the outset, the factual background in Oliver's opening brief is deficient because it frequently omits record citations or uses lengthy string citations at the end of each paragraph. And, when citations are provided, those citations often fail to support the alleged facts. These infirmities violate rule 8.204(a)(1)(C) of the California Rules of Court, constraining our review and permitting us to disregard the offending portions of the brief. (See *Myers v. Trendwest Resorts, Inc.* (2009) 178 Cal.App.4th 735, 745; *Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826, fn. 1.)

3

program director and director of operation, and who in turn referred Cannon to the rest of the staff. Cannon's brother, Perry Bailey, worked with Cannon to run West Coast but was not on the payroll.

2. *West Coast's falsification of patient records*

West Coast's business was based on billing Medi-Cal. Cannon handled the billing, payroll, and accounting. From the opening of West Coast through its 2013 closure, Oliver served as medical director, signing off on files, plans, and billing. He received a salary of $1,500 per month, which later increased to $2,500 per month. As a Medi-Cal facility, West Coast agreed to provide only medically necessary services and, as medical director, it was Oliver's responsibility to ensure compliance with Medi-Cal rules and regulations.

Jessica Moreno worked at West Coast as a counselor, although she had no certification or counseling experience or training. Administrators instructed Moreno to alter patient charts to reflect drug and alcohol abuse when they had actually sought treatment for parenting or anger management, because otherwise Medi-Cal would not pay them. If Moreno listed anger management or family relations in the file, Cannon or Bailey would return the file and instruct her to list alcohol or substance abuse. Love left West Coast in 2009 and Moreno became the acting director, still reporting to Bailey.

Cannon, Bailey and Moreno directed counselors to fill in incomplete intake forms with false information and input progress notes in files of patients who the counselors never counseled. Bailey charged Moreno with ensuring that West Coast reported 300 youth and 200 adult clients to Medi-Cal each month, even though West Coast only saw about 50 individual

4

youth and 20 adult clients per month. To accomplish this, approximately twice per month, Bailey gave counselors patient names and dates so they could prepare false progress notes in the files. If the counselors refused to falsify notes, then their paycheck was withheld, a practice which did not stop even after the counselors complained.

Oliver visited the office once or twice per month to review files, sign them, and return them to counselors. Bailey gave counselors advance notice when Oliver planned to visit the office, and withheld counselors' paychecks if the files were not ready for Oliver's signature. Neither Oliver nor any other doctor conducted examinations or required medical preapproval for counseling, and there were no examination rooms at the facility. Oliver signed a physical examination waiver for clients.

Every few months, the files were returned to Oliver for his required sign-off on continued services. The files often contained inconsistencies, from biographical information to diagnoses and treatment plans, but Oliver never questioned them.

Bailey also instructed the counselors to list group sessions as lasting three hours, even though no sessions went that long. If counselors failed to do so, their pay checks would be withheld until "necessary corrections" to the entries were made. Each month, patient files were verified to determine whether a patient was Medi-Cal eligible and if they were, Medi-Cal continued to be billed for a year regardless of whether the patient came to the clinic.

Counselors complained about the falsification of records during a staff meeting with Cannon, Bailey, Oliver, and Moreno. Oliver said to Bailey, "You need to stop doing that with the staff." The counselors were asked to leave the meeting room. After the

meeting, Oliver continued to sign off on patient visits that had not occurred.[3]

In one instance, a counselor was fired and left with 20 to 50 patient files. Moreno told Cannon that because a Medi-Cal audit was scheduled, the files needed to be recreated. Cannon told Oliver what had occurred and Oliver agreed to sign the re-created files. West Coast passed the audit based upon the re-created files.

In 2010, Cannon informed Oliver that counselors complained about falsifying records. Oliver laughed and said, "I told you that the counselors would be the ones to take you down." West Coast's practices were unchanged thereafter.

*3. Increase in falsification under Juanita Antiporda*

In 2012, Cannon learned that Moreno lacked the credentials under Medi-Cal for the director position. Cannon and Bailey had also complained that Moreno was not bringing in enough patients. Cannon approached Oliver about replacing Moreno and Oliver recommended Juanita Antiporda as someone who could increase the number of clients. Cannon hired Antiporda as director.

West Coast was doing well financially prior to Antiporda's hiring, making $1.5 million annually. After Antiporda's hiring, earnings increased by millions of dollars. The false billing continued. West Coast also began offering incentives to encourage Medi-Cal recipients to come into their office and provide their Medi-Cal card in exchange for vouchers for food,

---

[3] Oliver's opening brief suggests that Moreno testified that Oliver only attended two *management* meetings, but the testimony from Moreno cited by Oliver establishes he only attended two *staff* meetings of which Moreno was aware.

6

clothes, and transportation.  The patients never returned and West Coast would use their files to bill Medi-Cal for services for a year and then discharge them.  Parents were recruited to bring their children to get services they did not need in exchange for bus passes.  Oliver suggested that West Coast pay group homes for referring clients to West Coast.  When CNN reporters came to West Coast to interview Oliver, Antiporda told Moreno to locate clients to come into the office and put in rooms to receive counseling.

In May or June 2012, Moreno complained to Oliver about the increase in false patient files and chart entries.  Oliver told her not to do it and to write down every incident she had with Bailey.  Bailey called her a snitch and as punishment gave her more patient files to sign.  If Moreno refused to sign progress notes or forge clients' signatures, Bailey withheld her paycheck.  Oliver eventually called Moreno into a meeting and told her she was suspended for insubordination, and specifically not following Bailey's instructions.

When Moreno returned, she was transferred to a quality assurance role in which she examined billing statements for completeness and Oliver's later signature.  The number of false patient files only increased.  Cannon discussed the increased revenue with Oliver, and told him that she planned to sell West Coast for $3.5 million—a valuation that included the fraudulent billing—and give Oliver 20 percent.  Oliver was glad.

Natasha Ashley worked as a West Coast intake counselor in 2012.  Ashley complained to Antiporda, Cannon, Oliver, and Bailey about having to write notes on clients she had not counseled.  In one instance, Ashley placed a file for a patient she had not counseled on Antiporda's desk, and Antiporda gave the

7

file back to Ashley. This prompted Ashley to take a leave of absence, which she also described as resigning her position.

Bailey later asked Ashley to return to clean up files she had handled. Ashley returned to discover her initials accompanying notes that she did not write. Ashley showed Oliver her forged signature and told him about her disagreement with Antiporda. Oliver did not ask her to elaborate and said that he would discuss it with Antiporda.

Starting in 2012, Leonard Olivas performed counseling and office manager duties for West Coast. In February 2013, Olivas raised billing discrepancies with Oliver, and Oliver did not seemed surprised and responded, "Don't worry about it. It's okay." After that conversation, Olivas was demoted and no longer performed office manager duties.

*4. Oliver's other business ventures*

From 2006 to 2017, Gwendolyn Grove worked at Central Desert. Central Desert received credit card payments, cash payments, and private insurance, but did not accept Medi-Cal patients. Grove was quickly elevated to the director of operations, overseeing daily operations, payroll, staff, supply orders, and meeting Oliver's needs.

Because Oliver was tired of having to manage Central Desert, he approached Grove and offered her part ownership, with Oliver retaining 51 percent and Grove holding 49 percent of the company. This split was necessary as only a physician could own a medical group such as Central Desert, and Grove was not a physician. Grove agreed and on January 1, 2010, Oliver gave Grove written agreements authorizing Grove to manage Central Desert under the corporation Grove Medical Management (Grove Medical)—a name Oliver chose. Oliver instructed Grove

8

regarding corporate formation, general and payroll bank accounts, as well as filling out a fictitious business name statement so that Grove could deposit checks for both companies, Central Desert and Grove Medical. Grove and Oliver had access to both business's bank accounts. Central Desert staff was informed that Grove was now part owner and to approach her if they needed anything. Thereafter, Oliver did not often visit Central Desert, and instructed Grove to communicate only verbally and not by text messages or email.

Cannon did Central Desert's taxes and accounting from 2009 to 2015, listing income based on figures Oliver provided. Oliver only reported income from checks, not cash or credit card payments. Oliver furnished deposit slips only from Central Desert—and not Grove Medical—to Cannon.

Grove sent Cannon deposit slips from check deposits into the Central Desert bank account. Grove deposited checks made out to Central Desert into the Grove Medical account, a practice of which Oliver was aware. Grove did not send Cannon any deposit slips for deposits into the Grove Medical account. Grove did Grove Medical's accounting, but did not file tax returns on its behalf. Credit card payments were deposited into Central Desert's bank account and were eventually transferred into Grove Medical's account, a practice of which Oliver was also aware. Cash payments of approximately a couple hundred dollars per week were given to Oliver and not documented for tax purposes. Regarding their not reporting these payments to Cannon, Oliver said to Grove: "What the IRS didn't need to know, they didn't need to know." Central Desert also entered into an agreement with a medication supply company obligating payments to Central Desert, but Grove deposited their checks

9

into the Grove Medical bank account and Cannon was never informed of the agreement.

Grove withdrew a few thousand dollars in cash several times per month from Grove Medical's bank account to deliver to Oliver. Grove never declined Oliver's requests for money because Oliver yelled and threw things when he was mad.

5. *Department of Justice investigation*

The Department of Justice investigative auditor assigned to investigate West Coast determined that Medi-Cal paid West Coast approximately $2.8 million between January 2010 and September 2013, approximately half of which was for one-on-one counseling for three hours per day three days per week. Such services comprised 32 percent of West Coast's billing in its first year. Those services increased by almost four times the next year, and almost doubled every year over the next three years. Additionally, the investigation revealed that Oliver had deposited several hundred thousand dollars worth of checks into the Central Desert and/or Grove Medical accounts that went unreported on Central Desert's tax returns. Central Desert failed to pay $203,744 in taxes over four years.

6. *The prosecution's expert testimony*

Dr. Elizabeth Romero testified that, in order to bill Medi-Cal, a business must take Medi-Cal patients, agree to be audited, and provide medically necessary services. Upon reviewing approximately 700 files of West Coast's Medi-Cal patients, Romero determined that West Coast's medical records did not support the claims it submitted. Among other things, the files did not contain Oliver's required assessments of medical necessity.

According to Romero, a physical examination is required before determining counseling is necessary, and that requirement can only be waived under certain circumstances. Oliver signed waiver forms without adequate justification. In every case reviewed, Oliver waived the examination, did not examine the client, and failed to establish medical necessity. Oliver also never declined a patient for counseling and never referred a patient to a higher level of care. Romero opined that it was improbable that all 700 patients would have had a medical need for counseling.

## B. Defense evidence

During an interview, Ashley told Department of Justice investigator Crispin Beltran that West Coast fired her for complaining about having to write a report on a patient she never saw.

## DISCUSSION

## I. The trial court did not err in denying Oliver's mistrial request

Oliver contends that the trial court abused its discretion when it denied a mistrial after Ashley said during her trial testimony that Oliver was " 'guilty of signing charts.' " We disagree.

### A. Relevant factual and procedural history

During defense counsel's cross-examination of Ashley, the following sequence of events occurred, forming the basis for the claims we address in sections I & II of this opinion:

"Q. Right. And you told Agent Beltran that the only time you complained to Dr. Oliver was when you were called back to do the recreation of the files; correct?

"A. Yes.

11

"Q. And you also said that you had complained in January to Perry Bailey, correct?

"A. Yes.

"Q. Because you were dating Perry Bailey, correct?

"A. False.

"Q. You didn't tell them you were dating Perry Bailey?

"A. I did not tell him I was dating Perry Bailey.

"Q. Did you tell him you—

"A. I told him I went on a date. A date and dating is different.

"Q. Okay. So Perry Bailey asked you out; correct?

"[Prosecutor]: Objection, Your Honor; relevance.

"The Court: Do you—

"[Defense counsel]: It goes to bias.

"The Witness: I don't understand why he's going through this. You guys know that man is guilty of signing charts.

"The Court: Ma'am—Ma'am, quiet.

"[Defense counsel]: Move to strike everything she said.

"The Court: Everything is stricken.

"Ma'am, I have to advise you, you cannot speak out of order in court.

"The Witness: I'm sorry. I'm sorry, but this is irritating my soul.

"The Court: All right. Stop, ma'am. Please, stop.

"The Witness: I come from Nevada sick, and they know this man is guilty."

After the jury was excused, the court admonished Ashley and indicated that the objection was sustained because the court did not think that Ashley's "one date with Perry Bailey" evinced

12

bias.[4]  Defense counsel asked for a mistrial based upon Ashley's assertion that Oliver was guilty.  The court denied the motion, stating that it would again instruct the jury that the testimony is stricken and that the jury's opinion based on the evidence is what matters.

The trial court subsequently admonished the jury as follows: "Ladies and gentlemen of the jury, obviously, if somebody is not feeling well, it's always difficult.  So I'm just going to remind you that I reminded you—of the instruction at the beginning of the trial:  If I issue a ruling, that you're to strike testimony, and that testimony is not to be considered for any purpose whatsoever.  [¶]  So any last question and last answer that you might have heard, we're going to strike it.  Also remember that the whole point of a trial is for the jury's opinion to decide if something occurred or not.  That's why we don't have anybody else testify to their opinions whether they think somebody did an act or not.  It's for 12 independent jurors to decide, and only based on facts presented in the case, not opinions."

The court later instructed the jury with CALCRIM No. 222, stating in pertinent part: "During the trial, the attorneys may have objected to questions or moved to strike answers given by the witness[es].  I ruled on the objections according to the law.  If I sustained an objection, you were to ignore the question.  If the witness was not permitted to answer, please do not guess what the answer might have been or why I ruled as I did.  [¶]  As you

---

[4]  Later, when Oliver called Beltran to testify as part of the defense case, defense counsel attempted to ask Beltran whether Ashley told Beltran that she had dated Bailey, the court sustained objections to the questioning on relevance grounds.

13

heard throughout the trial, sometimes the witness answered anyway, so if I ordered testimony stricken from the record, you must disregard it and not consider that testimony for any purpose."**5**

B. *Relevant legal principles*

"A trial court should grant a motion for mistrial 'only when " 'a party's chances of receiving a fair trial have been irreparably damaged' " ' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction' [citation]. 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.] Accordingly, we review a trial court's ruling on a motion for mistrial for abuse of discretion." (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

---

**5** During the charge conference, defense counsel again moved for a mistrial, and also requested a modified version of CALCRIM No. 316 (Additional Instructions on Witness Credibility—Other Conduct) that included the following language: " 'During this trial you received an admonition from the Bench in reference to an angry outburst, in open court, of personal animosity and opinion by Prosecution Witness Natasha Ashley against [Oliver]. You MUST abide by the admonition from the Bench and you are not to discuss Ms. Ashley's outburst in any manner during your deliberations.' " The court denied those requests, reasoning that Oliver's proposal was already covered by CALCRIM No. 222 and that a more tailored instruction would give the testimony more deference than it was worth. Because Oliver raises no separate argument with respect to the denial of that request, we do not address it further.

"Although most [mistrial requests] involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice." (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1581.) "[A] trial court can almost always cure the prejudice of an improperly volunteered statement by granting a motion to strike and charging the jury with an appropriate curative instruction." (*People v. Navarrete* (2010) 181 Cal.App.4th 828, 836.) "A jury is presumed to have followed an admonition to disregard improper evidence particularly where there is an absence of bad faith. [Citations.] It is only in the exceptional case that 'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' " (*People v. Allen* (1978) 77 Cal.App.3d 924, 934–935.) Such a case may exist when " 'the incompetent evidence goes to the main issue and where the proof of defendant's guilt is not clear and convincing.' " (*People v. Hardy* (1948) 33 Cal.2d 52, 61; *People v. McKelvey* (1927) 85 Cal.App. 769, 771.)

An erroneous denial of a mistrial request prejudices the defendant only if it is reasonably probable that, but for the admission of the material upon which the motion was based, the defendant would have obtained a more favorable outcome. (See *People v. Welch* (1999) 20 Cal.4th 701, 749–750; *People v. Watson* (1956) 46 Cal.2d 818 [harmless error standard applies to denial of mistrial based on erroneous evidentiary ruling].)

   *C. The trial court's denial of Oliver's mistrial request was*
       *not erroneous*

Here, the record demonstrates that the trial court's refusal to grant a mistrial was not an abuse of discretion. It is well established that "[a] witness may not express an opinion on a

defendant's guilt." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.) However, the trial court promptly recognized this when, immediately after Ashley made the challenged statement, it acted to remedy the problem by striking the testimony and admonishing the jury to disregard it. The court then excused the jury and discussed the issue with counsel. The jury was thereafter not only advised that the challenged testimony had been stricken from the record and was not to be considered "for any purpose whatsoever," it was also told that whether someone committed certain acts was "for 12 independent jurors to decide, and only based on facts presented in the case, not opinions." Later, the jury was instructed—in a sum and substance for a third time—that all questions and answers that were the subject of sustained objections must be ignored, and not considered "for any purpose."

As noted, admonitions of this nature are typically adequate cures for an error in the admission of evidence, especially when the error was not a product of bad faith. (*People v. Allen, supra,* 77 Cal.App.3d at p. 934.) Here, the defense elicited this testimony, and thus it cannot be said the prosecution instigated the evidentiary violation in bad faith. Further, Ashley was not in law enforcement and was not otherwise suggested to have " 'an aura of special reliability and trustworthiness' " as to the question of whether Oliver's conduct was criminal in nature, a situation which might have otherwise counseled for additional caution. (*United States v. Gutierrez* (9th Cir. 1993) 995 F.2d 169, 172; see *United States v. Scanio* (2d Cir. 1990) 900 F.2d 485, 493 [similar].) Even were that not the case, Ashley's allegation that Oliver was "guilty of signing charts" did not actually equate with guilt of any of the charged offenses. Oliver was not charged with

16

merely "signing charts," and there was no dispute that Oliver had signed charts during his tenure at West Coast. Rather, as Oliver himself acknowledges, the primary disputed issue at trial was whether Oliver knew that the documents he signed contained false information.[6] Ashley's stricken outburst had minimal bearing upon *that* question.

Moreover, there was ample other evidence of Oliver's knowledge beyond what Ashley—who became employed at West Coast in 2012, years after the commencement of the fraudulent conduct and only one year before the facility's closure—had witnessed. Moreno, for example, testified that counselors complained in Oliver's presence about falsifying records, but nothing changed. Then, when Moreno complained directly to Oliver and Oliver told her not to falsify records and to write down every incident with Bailey, Bailey approached her and called her a snitch and punished her by giving her more files. After Moreno continued to refuse to forge patient files, Oliver called her into a meeting and suspended her, citing her inability to cooperate with Bailey. The falsification again did not abate. Counselors such as Olivas continued to approach Oliver with complaints, but Oliver did not seem surprised and told them not to "worry about it." Olivas was then demoted. Cannon, too, reported that when she approached Oliver about the counselors' complaints, Oliver laughed and said, "I told you that the counselors would be the ones to take you down."

---

[6] Oliver does not suggest that Ashley's testimony had any relation to the tax evasion convictions pertaining to Grove Medical. We thus do not address the errors as they relate to those convictions further.

17

The evidence of Oliver's knowledge that the documents he was signing contained false information was overwhelming, and Oliver's contrary arguments are unavailing. Oliver points to further interactions such as when he told Bailey "[y]ou need to stop doing that with the staff" after Moreno raised concern about the falsification of records as evidence that he was attempting to "put a stop" to West Coast's falsification of records. However, Oliver's construction of that evidence is unsupported by the record. As noted, the record is replete with examples of Oliver continuing to sign off on false records in the face of complaints from Moreno and other counselors, and condoning if not directly retaliating against them for said complaints. Especially where there was evidence that Oliver was cognizant of the implications of leaving a paper trail and speaking openly regarding his frauds, the jury's declining to credit Oliver's alleged discouragements was eminently reasonable.[7]

---

[7] Oliver's further arguments that Ashley's statement was prejudicial because there was no evidence that he personally directed an employee to falsify records and because the statement constitutes improper predisposition evidence under Evidence Code section 1101 are likewise meritless. Oliver cites no authority supporting the proposition that an express directive of that nature is required to demonstrate knowledge, and we are aware of none. (Cf. *People v. Harbert* (2009) 170 Cal.App.4th 42, 55 [" 'knowledge, like other facts, may be proved by circumstantial evidence' "].) Further, the fact that evidence prompting a mistrial request may run afoul of Evidence Code section 1101 does not singularly establish prejudice from the denial of that mistrial request. (See *People v. Welch* (1999) 20 Cal.4th 701, 749–750 [erroneously admitted Evid. Code § 1101 evidence subject to prejudice analysis].)

18

Under the circumstances, there is no reason to believe that Ashley's isolated remark was of such an exceptionally prejudicial nature that the jury would not follow the court's instructions aimed at curing any potential prejudice from the improper testimony.  We therefore conclude that the trial court did not err in denying a mistrial.

## II. The trial court did not err in refusing Oliver's request to cross-examine a witness for bias and motive

Oliver further contends that the trial court abused its discretion when it refused to permit counsel to explore Ashley's alleged relationship with Bailey.[8]  We again disagree.

A party may cross-examine a witness about bias and motive.  (Evid. Code, § 780, subd. (f).)  Nonetheless, trial courts may "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  "[T]he latitude [Evidence Code] section 352 allows for exclusion of impeachment evidence in individual cases is broad.  The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296.)

We review a trial court's exclusion of impeachment evidence for an abuse of discretion.  (*People v. Clair* (1992) 2

---

[8]     Oliver does not claim that this evidence's exclusion violated his constitutional right to present a defense or confront witnesses.

Cal.4th 629, 655.) "Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation] a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*People v. Clark* (2011) 52 Cal.4th 856, 932.)

Here, the exclusion of the alleged impeachment evidence was not an abuse of discretion. The probative value of the alleged bias/motive evidence was minimal, at best. Ashley denied that she "was dating" Bailey, specifically correcting defense counsel that she merely went on "a date" with Bailey, and that "a date and dating [were] different." Further, Ashley implicated Bailey in the scheme when she testified that he made her come back to clean up patient files, and further that she complained about Bailey to Oliver, evidence that further underscores Ashley's lack of bias in Bailey's favor. Given the impeachment evidence's minimal probative value and the likelihood of unnecessary consumption of time, if not undue prejudice and confusion of the issues, the trial court soundly exercised its broad discretion by precluding Oliver from inquiring further as to Ashley's alleged relationship with Bailey.

However, even were we to find error, Oliver does not explain how the allegedly erroneous evidentiary ruling prejudiced him, offering only a conclusory sentence in his opening brief and declining to file a reply brief to address the Attorney General's contrary arguments. (See, e.g., *People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11 [defendant bears burden of spelling out how the alleged error prejudiced him].) Based on our independent review, we cannot say much about the prejudice to Oliver, either. It was not reasonably probable that Oliver would

have obtained a more favorable verdict had he been allowed to probe Ashley's purported relationship with Bailey.  (See *People v. Cunningham* (2001) 25 Cal.4th 926, 999 [exclusion of evidence under Evidence Code section 352 that does not implicate constitutional right governed by *People v. Watson*, *supra*, 46 Cal.2d 818].)  The bulk of our prejudice discussion in the preceding section applies equally here, most notably that there was ample other witness testimony beyond Ashley's corroborating Oliver's awareness of the falsification of patient records.

For these reasons, the trial court did not err, much less prejudicially err, by denying Oliver's request to further inquire as to Ashley's motive or bias.

## III.    Assembly Bill No. 518 requires resentencing

Oliver's seven year eight month aggregate sentence is comprised of the low term of two years for count 2, plus a middle term of three years for the enhancement that the loss exceeded $500,000 (§ 186.11, subd. (a)(2)), and eight months each for counts 7 through 10.[9]  The court also imposed a concurrent

---

[9]     The Attorney General suggests that the single enhancement on count 2 reflected in the abstract of judgment does not correspond with the two enhancements pronounced at sentence.  However, after the court pronounced a sentence of one year for the enhancement that the loss exceeded $1.3 million (former § 12022.6, subd. (a)(3)) and two years for the enhancement that the loss exceeded $500,000 (§ 186.11, subd. (a)(2)), the prosecutor pointed out that a three-year term was required for the section 12022.6, subdivision (a)(3) enhancement.  As a result, the court struck that enhancement and imposed a three-year term on the section 186.11,

sentence of one year four months on count 1 and 16-month sentences for counts 3, 4, and 6 and stayed them under section 654.  On appeal, Oliver asserts that Assembly Bill No. 518 (2021–2022 Reg. Sess.) requires that his case be remanded for resentencing to permit the court to exercise its discretion to stay his conviction on count 2 rather than count 1, pursuant to section 654.  The Attorney General agrees, as do we.

Assembly Bill No. 518, which took effect on January 1, 2022 (days after Oliver's December 7, 2021 sentencing), amended section 654 to provide, in pertinent part:  "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (See Stats. 2021, ch. 441, § 1; *People v. Mendoza* (2022) 74 Cal.App.5th 843, 862; cf. former § 654 [requiring sentencing court to impose the sentence that " 'provides for the longest potential term of imprisonment' " and stay execution of the other term].) Oliver is entitled to the benefit of Assembly Bill No. 518, permitting the court to exercise its sentencing discretion pursuant to section 654.  (*In re Estrada* (1965) 63 Cal.2d 740, 745; *People v. Sek* (2022) 74 Cal.App.5th 657, 666–667.)  A trial court must exercise its informed discretion when sentencing a defendant.  (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)  If the court proceeds on the assumption that it lacks discretion, remand for resentencing is required unless the record " 'clearly indicate[s]' " that the court would have reached the same conclusion had it been aware of its discretionary powers.  (*Ibid*.)

---

subdivision (a)(2) enhancement.  Thus, the abstract of judgment accurately corresponds with the court's oral pronouncement.

22

As noted, Oliver was convicted of five counts related to Medi-Cal fraud (counts 1 through 4 and 6) and four counts related to tax evasion (counts 7 through 10). Under the former statute, the trial court was required to impose the longer sentence for count 2 and to stay the sentences for counts 1, 3, 4, and 6 because, as the trial court recognized, those five counts arose out of "essentially all the same course of action." Under the amended statute, the trial court now has discretion to sentence Oliver under one of the less severe provisions (counts 1, 3, 4, or 6) and stay sentences on the other counts arising out of the same acts and omissions (including count 2).

Because there is no clear indication that the trial court would have reached the same conclusion had it been aware of its discretion, we agree with the parties that remand for resentencing is required so that the trial court may consider whether to exercise its discretion to stay Oliver's sentence upon count 2 under the amended section 654.[10]

---

[10] Oliver does not raise any challenge to the restitution order under section 1202.4, subdivision (f). Because the imposition of restitution under section 1202.4, subdivision (f) is mandatory and cannot be stayed (see Cal. Const., art. I, § 28, subd. (b); see also *People v. Woods* (2010) 191 Cal.App.4th 269, 272–273), our opinion does not disturb the restitution order.

## DISPOSITION

Howard Oliver's sentence is vacated and the case is remanded to the trial court for resentencing.  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                    HEIDEL, J.[*]

We concur:

    EDMON, P. J.

    EGERTON, J.

---

    [*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.